## IRVING TRUST CO. v. DEUTSCH et al.

District Court, S. D. New York.
Dec. 9, 1932.

Ernst, Gale, Bernays & Falk, of New York City (Murray Bernays, Emily C. Holt, and Abraham Friedman, all of New York City, of counsel), for plaintiff.

Strauss & Abrahams, of New York City (Jerome A. Strauss, of New York City, of counsel), for defendant Deutsch.

White & Case, of New York City (Lowell Wadmond, of New York City, of counsel), for defendant Hammond.

Rushmore, Bisbee & Stern, of New York City (H. G. Pickering and Eldon Bisbee, both of New York City, of counsel), for defendant Biddle.

Harold L. Allen, of New York City, for defendants B. C. Bell and B. C. Bell & Co., Inc. (formerly A. D. Mendes & Co., Inc.).

Hays, St. John, Abramson & Schulman, of New York City (John Schulman, of New York City, of counsel), for defendant Mendes.

Larkin, Rathbone & Perry, of New York City (Thomas H. Dugan, of New York City, of counsel), for defendant Martin.

Irving P. Turman, of New York City, for defendant Stein.

Metcalf, McInnes, Allen & Hubbard, of New York City (Martin Conboy, David Asch, and Orlando P. Metcalf, all of New York City, of counsel), for defendants Wiley R. Reynolds and W. R. Reynolds & Co.

WOOLSEY, District Judge.

I dismissed the bill of complaint, without costs, as against the defendant Arthur D. Mendes and Royce G. Martin at the conclusion of the trial; it had previously been dismissed on an interlocutory motion for lack of proper venue in this district as against the defendant Malcolm R. White.

The bill of complaint herein is now dismissed, without costs, as against the other defendants remaining in the cause.

I. By way of introduction to the focal questions which have to be decided in this cause, and as illustrative of the somewhat unstable financial and commercial situation to which, on its formation, the bankrupt company succeeded, the following very general summary of the circumstances which led to its genesis will, I think, be of value:

A. About 1919 a Mr. Brightson, who was the president of the Sonora Phonograph Company, and, in a period of four or five years, had built it into a successful concern, was introduced to Messrs. Hayden, Stone & Co. During the last previous three or four years the business of the company had been expanding very rapidly. In the last year or two prior to 1919 it had been making very good profits, and in 1919 it found that it needed additional working capital to finance its growing business.

Mr. Brightson was unable himself to provide this additional capital, and Messrs. Hayden, Stone & Co., on looking into the business, decided it was in good condition, and bought 10,000 shares of a new preferred stock issue, most of which was sold to customers of Hayden, Stone & Co. at $100 per share, producing approximately $1,000,000 for the additional capital needed by the company.

Within a year or two after this first financing, the phonograph business went into a slump, and the profits of the Sonora Phonograph Company were much reduced. It then needed further funds, this time not for the purpose of expanding its business, but because it had run short of working capital due to overproduction and inability to market its products.

Thus, within two years after the issue of the preferred stock above referred to, the Sonora Phonograph Company, which will hereinafter be referred to as Old Sonora, was in difficulties, and Hayden, Stone & Co., to help it out, and with the hope of protecting their customers who had bought the preferred stock, also bought a block of common stock.

The business, however, did not improve in the succeeding years. Mr. Brightson himself got into financial difficulties, and finally Hayden, Stone & Co. were forced to buy in some of his stock in the company which had been deposited with them as collateral for loans made to him individually.

As the business of the Old Sonora continued to be poor, it had to borrow money. Finally a committee had to be formed by the banks which had lent this money in order to protect their loans. Hayden, Stone & Co. cooperated with the banks, helped to select a new president for the company, and tried to work it into a better financial and business position.

Within two or three years, Mr. Martin, the new president of the company, was able largely to liquidate the surplus inventory and to get the bank loans down to a nominal figure. The banks then withdrew from the situation leaving Hayden, Stone & Co. as the controlling financial factor therein.

During this period the Old Sonora still was without enough capital, and Hayden, Stone & Co. had to advance money to it whilst they were trying to work out some plan by which the company's business could be continued to advantage. As a result, by the middle of August, 1927, Hayden, Stone & Co. had advanced to the Old Sonora $400,000.

At that time Hayden, Stone & Co. owned 70,000 shares of Old Sonora common stock which had cost them $500,000, also 36,914 shares of Old Sonora common stock bought from Brightson, and had purchased for themselves approximately 2,400 shares of the preferred stock at various prices from $80 to $30 per share.

Hayden, Stone & Co. were, therefore, personally quite heavily involved in the Old Sonora, and, in addition, their clients had bought its preferred stock through them and dividends thereon had not been paid for some years.

B. The first contact between Mr. Deutsch and Hayden, Stone & Co. involving Old Sonora in any way seems to have occurred in 1925, when Mr. Hoyt, of Hayden, Stone & Co., who had met Mr. Deutsch and knew that he was vice president of the Brunswick-Balke-Collender Company, in charge of its radio and music division, spoke to him with regard to the affairs of the Old Sonora, which, owing to the fact that its product had not kept up with the development in sound reproducing and recording devices, was, as noted above, then in an unstable financial situation.

At that time Mr. Hoyt had some talk with Mr. Deutsch regarding his attempt to reorganize Old Sonora and suggested that Mr. Deutsch should come in as president; but Mr. Deutsch did not then wish to leave his own organization in which he and his family had long been interested.

During the late spring or early summer of 1927, however, Mr. Deutsch approached Mr. Hoyt regarding the reorganization of the Old Sonora, and stated to Mr. Hoyt that he was not quite satisfied with the situation in his own business, and wondered whether something might be done in the development of the Old Sonora along the lines of their earlier discussion of 1925.

This conference resulted in the negotiations which led eventually to the creation of the Acoustic Products Company, Inc., by which name the now bankrupt company, of which the plaintiff is trustee, was known during the period with which we are principally concerned in this litigation.

C. During the exploration of the possibilities which might be worked out with the Old Sonora, it was considered, inter alia, whether an attempt should be made to purchase the music and radio division of the Brunswick-Balke-Collender Company, of which Mr. Deutsch previously had charge.

This plan, however, was quite promptly dropped.

Later, Mr. Deutsch told Mr. Hoyt of a patent situation which he had discovered, and which he considered might offer an opportunity to Old Sonora to go into the radio and other electrical sound reproduction fields. The patent referred to was an invention of Dr. Miller Reese Hutchison which was known as the melodon.

The melodon was an electric loud speaker of great apparent potential value. It was first shown to Mr. Deutsch and Mr. Hoyt at the apartment of Mr. Harris Hammond, one of the defendants herein. On that occasion Mr. Hoyt also met the defendant Mr. Biddle.

Mr. Hammond, Mr. Biddle, and Dr. Miller Reese Hutchison, who will be hereinafter referred to as the Bid-Hamson Group, had some time before this formed two companies, one, the Premier Laboratory Company, principally for experimental purposes, and the other, the Bid-Hamson Corporation, which, among other patents, owned the melodon.

One of the reasons why the Bid-Hamson Group were interested in going into combination with Old Sonora was in order that a market might be developed for the melodon and its manufacture, which was expensive, might be made commercially practicable.

It was finally agreed between Mr. Hoyt, Mr. Deutsch, and the Bid-Hamson Group to make a combination, with Old Sonora as its core, with the Bid-Hamson Corporation and the Premier Laboratory Company. Thereafter, on September 15, 1927, a contract was entered into between them for the consolidation of these three companies by the creation of a new company under the laws of Delaware, to be known as the Acoustic Products Company, Inc., which was to exchange its stock for the patents of the Bid-Hamson Corporation and the Premier Laboratory Company and the stock of the Old Sonora.

II. Accordingly, on October 6, 1927, the Acoustic Products Company, Inc., hereinafter referred to as Acoustic, was incorporated under the laws of Delaware.

On October 8, 1927, there was a meeting of Acoustic incorporators held, by-laws adopted, and temporary directors elected.

On October 18, 1927, there was a directors' meeting of Acoustic held at which the by-laws were amended by fixing the number of directors at seven. Mr. Deutsch was elected president and director, and the defendants Hammond and Biddle, together with R. T. Watt, Dr. Miller Reese Hutchison, and A. C. Sherwood, and R. F. Hoyt, of Hayden, Stone & Co., were elected directors. Mr. Hammond was elected chairman of the board of directors.

At that meeting, in addition to the election of these directors, the offers of Premier Laboratory and Bid-Hamson to the company were accepted and arrangements authorized for the exchange of stock in Acoustic for the patents and patent applications owned by these companies (subject to licenses back to them for certain purposes not here relevant), and for the stock of Old Sonora.

There was in the Old Sonora employ a Mr. W. J. Keyes whom Mr. Martin had brought into the company as his treasurer when he became president thereof. After Mr. Martin left, Mr. Keyes continued in his capacity as treasurer for some time after the formation of Acoustic, the corporation with which we are here concerned. Thus Mr. Keyes, with the Hayden, Stone directors, gave for some time a certain continuity in the personnel of the situation here involved in spite of changes in the corporate structure.

On October 31, 1927, Mr. W. J. Keyes, treasurer of the new company, submitted to Mr. Hoyt an estimate of the capital requirements for Acoustic and its affiliated companies. He summarized the result of his figures by saying that the consolidated companies would need, for successful operation, approximately $2,000,000 of additional capital, $1,500,000 in the form of new invested capital, and $500,000 in bank loans.

The details of the original contract of September 15, 1927, between the Bid-Hamson Group and the Hayden, Stone Company is not of interest to us herein, but it should be noted that on November 29, 1927, the contract was modified so that its final provision, conditionally made, regarding the contribution to capital to Acoustic which should be made by the Bid-Hamson Group, was that they should subscribe and pay for $500,000 worth of the preferred stock of Acoustic, and that this sum should be loaned to them at 6 per cent. interest by Hayden, Stone & Co. on the joint and several notes of Messrs. Hammond, Biddle and Dr. Hutchison, payable June 30, 1928, secured by the stock as collateral.

The condition of this agreement was that the Bid-Hamson Group get subscriptions for preferred and common stock of Acoustic in the sum of at least $350,000 before 12 o'clock noon on December 3, 1927.

The necessary subscription was secured by that time. The note was given, and on December 6, 1927, at a special meeting of the board of directors, the status of the corporation's capital was reported as follows:

There had been paid in by Hayden, Stone & Co. for 5,000 shares of preferred stock, and 50,000 shares of the common treasury stock, the sum of $500,000.

There had been paid in by Messrs. Hammond and Biddle and Dr. Hutchison for the purchase of 5,000 shares of preferred stock and 50,000 shares of the common treasury stock (the money borrowed from Hayden, Stone & Co. under the note of December 3d), the sum of $500,000.

There had been paid in by Mr. David Dows for the purchase of 1,000 shares of the preferred stock and 10,000 shares of the common treasury stock, the sum of $100,000.

A subscription was offered and accepted from Mr. Percy L. Deutsch for 1,500 shares of the preferred stock and 15,000 shares of the common treasury stock, in the sum of $150,000, payable $25,000 in cash and the balance by a promissory note for $125,000, payable February 1, 1928, secured by certain shares of the stock of the Brunswick-Balke-Collender Company and of British Brunswick, Limited.

A subscription was offered and accepted from Mr. Milton Diamond for 1,000 shares of the preferred stock and 10,000 of the common treasury stock for the sum of $100,000, payable $10,000 in cash, and $90,000 by two promissory notes, the first in the sum of $40,000, payable January 2, 1928, and the second in the sum of $50,000, payable February 1, 1928, payment to be secured by deposit of 100 shares of preferred and 1,000 shares of common stock of the corporation.

At this same meeting, the board of directors of Acoustic, at the instance of Hayden, Stone & Co., passed a resolution authorizing it to lend to its subsidiary, Old Sonora, $35,000 to discharge an indebtedness to the Chemical National Bank due December 15, 1927, and to repay the advances made to it by Hayden, Stone & Co. as above mentioned, in the sum of $400,000, due on December 18, 1927.

These amounts were 'duly lent in pursuance of this authority, and those two items of indebtedness were discharged by Old Sonora.

It was quite natural that Hayden, Stone & Co., who had been involved in the Old So-

nora for such a long time, should have desired to have their advances to it repaid, especially as they had loaned $500,000 to the Bid-Hamson Group and a large part of Mr. Deutsch's subscription to Acoustic and all of Mr. Diamond's were represented only by their respective notes.

The circumstance of the repayment of this loan of $400,000 is mentioned, not in criticism of Hayden, Stone & Co., but to show that when Acoustic got off to its start it had far less capital than Mr. Keyes, with his experience in the business, had estimated as necessary to its successful operation.

Indeed, it is fair to say that it was hampered by lack of funds from the start, and its condition in this regard never mended during the period with which we are here concerned.

III. A. It had been realized from the beginning by Mr. Deutsch that, in order to have a successful company operating in the radio and electrical sound producing field, it would be necessary that it should have the right to manufacture under patents which represented the then achievements in the radio art.

The subsequent history of Acoustic, in so far as it concerns us, is a story of unsuccessful attempts of the president and directors of a financially weak company to secure such right from the owners of such patents and thus to lay the necessary foundation for any measure of commercial success.

It was early realized that two of the avenues by which this objective of the company might be achieved were, first, by securing licenses from the Radio Corporation of America, and, second, if that was not regarded as commercially feasible, to secure some kind of a relationship with the De Forest Radio Corporation, which was known to be a corporate invalid in the hands of the New Jersey Chancery Court.

It was found that to secure licenses from the Radio Corporation of America would not be commercially feasible, for the reason that royalties charged by it were too high, and because they covered, not only the particular patented device used, but also involved payment of a percentage of the price of the finished product, including the cabinet. Consequently, after considerable negotiations, it was determined that this avenue was closed to a company with the limited resources of Acoustic.

Accordingly, Mr. Deutsch in the early part of the winter of 1928 turned his attention to the possibility involved in the De Forest Radio situation, and some money was spent in making the necessary investigation thereof.

This investigation indicated that the De Forest Company had an unassignable right of user of valuable radio patents, but it was known that these patents were involved in a maze of litigation, and, although the reports of patent lawyers engaged by Acoustic to examine the technical status of these patent litigations were not entirely discouraging, the whole De Forest situation may fairly be described as that of an insolvent company whose principal assets were subject to challenge by litigation in almost every direction, as has been described in detail in the evidence of Mr. Samuel Darby.

Indeed, it seems to me that, although some of the optimistic prophecies of the patent lawyers have since come true, looking forward at the situation from 1928, the directors of Acoustic might very well have felt that, if they invested moneys of the company even in securing a control of De Forest, they would be subject to criticism by their stockholders, and that a fortiori, if they only secured a minority interest in a company whose situation was apparently so unstable both in the commercial and the patent field, they would be doing something which they would find very difficult to justify to their stockholders.

At the same time something had to be done in order to put Acoustic on a satisfactory commercial basis.

B. In connection with the investigation of the De Forest situation, it was learned by Mr. Deutsch that on January 18th W. R. Reynolds & Co., a corporation of which Wiley R. Reynolds was the principal stockholder, had made an offer to the De Forest Stockholders' Protective Committee which involved the purchase by Mr. Reynolds of 600,000 shares of new stock to be issued by the De Forest Company, at 50 cents a share.

The De Forest Radio Company, which had been formed some time prior to 1917, under the laws of New Jersey, had licensed the Western Electric Company to use certain patents owned by it covering devices in the radio field, and had retained only nonassignable rights of user in said patents.

The De Forest Radio Company was at this time, and since June 24, 1926, had been, in receivership under the Vice Chancery Court of New Jersey.

Mr. Reynolds had been a stockholder in the De Forest Company before it had gone into this receivership, and his offer was apparently made in an effort on his part to make up, if possible, some of the losses which he had suffered by reason of his ownership of De Forest stock.

Mr. Reynolds' offer of January 18, 1928, to the Stockholders' Protective Committee of De Forest, and the approval of it by the Stockholders' Protective Committee, reads as follows:

"January 18, 1928.

"Stockholders' Protective Committee of De Forest Radio Company:

"We hereby offer to purchase for Three hundred thousand (300,000) dollars at our option either Three hundred thousand (300,-000) Dollars principal amount of Five Year Six Per Cent. Convertible Notes of the De Forest Radio Company, as hereinafter described, or Six hundred thousand (600,000) shares of its non-par value common stock, upon the following terms and conditions:

"1. Duly called meetings of the stockholders and directors of the Company must be held and the present authorized capital stock, consisting of Two hundred and fifty thousand (250,000) shares of no par value, shall be increased to One million (1,000,-000) shares of no par value. There are also to be authorized the issue of Three hundred thousand (300,000) Dollars principal amount of Five Year Six Per Cent. Convertible Notes of the Company, convertible into its Common Stock of no par value, at any time before maturity, at the option of the holder, on the basis of two (2) shares of such Common Stock for each dollar of principal amount of such notes. If our election is to take the Five Year Six Per Cent. Convertible Notes, above referred to, proper arrangements must be made for the setting aside of Six hundred thousand (600,000) shares of the Common Stock of the Company of no par value for the conversion of such notes.

"2. No substantial change shall be made in the property assets or rights of the Company without our consent, and any such substantial change made without our consent shall, at our option, be considered a cancellation and withdrawal of this proposal, but the ordinary changes occurring in its property and assets in the conduct of the ordinary business of the Receiver and in winding up the affairs of the Company shall not be considered a substantial change within the meaning of this section.

"3. The Receiver of the Company now in possession of its assets in New Jersey must be fully and regularly discharged and there must be returned to the Company all of its property of every kind and nature and the Company must be free and clear of all judgments, suits, debts, claims and expenses of any kind whatsoever at the time of payment for the notes or the stock, as the case may be. Of the proceeds of the notes of stock not more than Two hundred thousand (200,-000) Dollars shall be used for the purpose of discharging the receivership and all debts and obligations of the Company above referred to, and of this amount not more than twenty-five (25) per centum of their claims shall be paid to the creditors in full settlement thereof.

"It is an absolute condition of this offer that the De Forest Radio Company shall by the use of the Three hundred thousand (300,-000) Dollars have all of its property and One hundred thousand (100,000) Dollars for working capital in its treasury free and clear of any taxes, liens, debts, claims and charges of any kind whatsoever and free from any contracts or agreements not acceptable to our attorneys, Messrs. Metcalf, McInnes, Allen & Hubbard.

"4. A majority of the Voting Trustees acting under the Voting Trust Agreement of De Forest Radio Telephone & Telegraph Company, dated September 20, 1924, are to be nominated by or acceptable to us and we shall also have the right to nominate and to have elected all of the members of the Board of Directors.

"5. The legality of all actions and proceedings taken hereunder and the validity or legality of any securities issued or to be issued and their availability for conversion of notes and of the organization of the Company and of the amendment to its charter, and the fact of the freedom of the Company from the claims, debts and liabilities above referred to, and all other matters and things herein mentioned, must be approved by our counsel before payment is made for the notes or stock, as the case may be.

"Upon compliance with the foregoing conditions to the satisfaction of our counsel, we will be prepared, on five (5) days' written notice to us at the American Trust Company, 135 Broadway, New York City, New York, at any time before Noon on April 3, 1928, to purchase for Three hundred thousand (300,000) Dollars at our option either Three hundred thousand (300,000) dollars principal amount of Five Year Six Per Cent.

Convertible Notes of the De Forest Radio Company or Six hundred thousand (600,000) shares of its non par value Common Stock, said Notes or Stock, as the case may be, to be taken up and paid for at the office of the American Trust Company above referred to. After Noon on April 3, 1928, if all conditions hereof have not been complied with, this offer shall expire and be entirely void.

"In the event of our purchase of either the notes or the stock we agree to use our best efforts to provide an efficient and economical management and organization to carry on the business of the company.

"This proposal is subject to acceptance by your Committee on or before January 19, 1928.

"If this proposal is satisfactory to your Committee, will you please sign the acceptance hereof appended hereto and return the duplicate hereof to us.
"W. R. Reynolds & Company,
"By Wiley R. Reynolds, President."

"The Stockholders' Protective Committee, at its meeting held January 19, 1928, duly approved of the foregoing proposal and hereby agrees to use its best efforts to carry the same into effect.

"Stockholders' Protective Committee
"By H. P. Nash, Secretary.
"Dated, January 19, 1928."

The formal resolution passed by the committee reads as follows:

"I, H. P. Nash, Secretary of the Stockholders' Protective Committee of De Forest Radio Company, do hereby certify that at a duly called meeting of the Stockholders' Protective Committee held January 19, 1928, at which a majority of the Committee were present, the following resolution was adopted:

"Resolved, that the proposal of W. R. Reynolds & Company, dated January 18, 1928, for the purchase for Three hundred thousand (300,000) Dollars, at their option, of either Three hundred thousand (300,000) Dollars principal amount of Five Year Six Per Cent. Convertible Notes or Six hundred thousand (600,000) shares of non par value Common Stock of the De Forest Radio Company, on the terms and conditions set forth in said proposal, be and the same hereby is approved.

"Further resolved, that the Committee use its best efforts to carry the same into effect.
"H. P. Nash, Secretary,
"Stockholders' Protective Committee."

It should be observed in this connection that what remained to be done in order that the Reynolds' offer might become effective was to be done by the Stockholders' Protective Committee. It was they who had to take such steps, by court proceedings or otherwise, as were required to meet the terms of this offer. Reynolds merely had to wait and to pay if his offer were met.

With this offer by Mr. Reynolds in the field, Mr. Deutsch and the Acoustic directors tried in many directions to make some arrangements by which they could improve thereon and thus get the De Forest Company away from Reynolds.

An attempt was made through a Mr. Costello to interest Mr. W. R. Hearst in a joint venture with Acoustic in the De Forest situation. This failing, an attempt was then made to interest bankers in assisting Acoustic in its effort to get the right, through ownership of the De Forest Company, to use the unassignable rights to patents which that company owned. These attempts were all unsuccessful.

The time for action was getting shorter every day, and every day Acoustic's financial condition was getting progressively worse, as will be shown hereinafter in greater detail.

IV. A. Finally, after all efforts to get financial assistance which would enable him to outbid Mr. Reynolds' offer had failed, Mr. Deutsch decided to treat with him direct.

On March 27, 1928, therefore, Mr. Deutsch wrote a letter to Mr. Victor C. Bell, who was then the vice president of Mendes & Co., a banking house with which Mr. Deutsch had been having some negotiations in connection with his attempt to get the De Forest Company. This letter, which has been marked as Exhibit 32, and which may fairly be regarded as the beginning of the series of occurrences on which this litigation hinges, reads as follows:

"March 27, 1928.

"Mr. Victor C. Bell, Messrs. A. D. Mendes & Co., 43 Exchange Place, New York, N. Y.

"Dear Sir: You are familiar with our capital structure, and know that we are only set up for the immediate needs of the programs of the Acoustic and Sonora Companies, so it will not be necessary for me to go over that phase of the situation. You further know of our interest in the De Forest Company, and in fact that we have been negotiating with the Receiver and the Vice Chancellor, in conjunction with the Hearst interests, for the purchase of the controlling interest and assets of this Company.

"The only other bid that seems to be forthcoming on this proposition is Mr. Wiley Reynolds', whom you have advised me is interested only primarily in the purchase of this stock for a turnover in the market or otherwise.

"I am having Mr. Reynolds' statement checked up today, to the effect that he has a definite contract with the directors of the De Forest Company to turn over to him 600,000 shares of the common stock of the company on the date which the Receiver has set for the sale of the assets. Irrespective of this, however, weighing each party's interests in the picture, a satisfactory arrangement could be made with Mr. Reynolds on the following terms and conditions:

"That he associate himself with you in the syndicate to purchase the preferred and common stock of the Acoustic Products Company. If the $300,000 which Reynolds is willing to put in the De Forest Company is used for the purchase of 3,000 shares of Acoustic preferred, he would obtain 30,000 shares of common stock as bonus. This 30,000 shares immediately shows him a bonus of from $75,000 to $90,000.

"$200,000 of his $300,000 we would put in the De Forest Company, with $200,000 of the Hearst interests, giving the De Forest Company $200,000 working capital, and $100,000 more working capital in the Acoustic Products.

"With the formation of your syndicate Mr. Reynolds and yourself to enter into an arrangement with Hayden Stone & Co., whereby you would obtain options on more stock, with the idea of completing the set up which you had in mind when you originally spoke to Hoyt.

"With the De Forest Company in control of Acoustic Products, the Acoustic stock would be easily marketable, and, when placed on the market, should be susceptible to considerable activity. This should be an important factor to Mr. Reynolds.

"As to the operation of the De Forest Company, the Acoustic Products Company, the personnel and organization of which you are familiar with, would supervise the development and manufacture of De Forest products, and the Sonora Company will enter into a contract with the De Forest Company to merchandise and sell the entire production—the Sonora Company paying to the De Forest

Company ten percent (10%) profit above the cost of their production. The Sonora Company, by reason of its distributor and dealer organization, is well equipped and qualified, under our management and direction, to build up a large volume of business for the De Forest Company. This arrangement will necessarily work to the most efficient program, both as pertains to manufacturing and selling for the De Forest Company, as the Acoustic Products Company, in its endeavor to keep its costs down, will manufacture both efficiently and economically in the De Forest plant. It further will see that only the best and most salable product is produced. as the Sonora Company will be responsible for its entire sale.

"For your information, will further say that we have in our research laboratories at the present time what we believe to be a revolutionary type of tube, which we will be prepared to manufacture in the De Forest plant, to be purchased by the Sonora Company at cost plus ten percent (10%).

"In the final analysis we believe this to be a very advantageous and satisfactory proposition for Mr. Reynolds, in view of his interest in the De Forest Company, as the De Forest Company is practically assured of ten per cent (10%) profit on its entire production, thirty percent (30%) of which would accrue to the Acoustic Products Company.

"In the event that Reynolds is interested in this proposal at first hand, I would suggest that he would proceed for the purchase, under his present proposal, with the distinct understanding, however, that he would turn over to the Acoustic Company 600,000 shares of De Forest common stock, for 3000 shares of Acoustic preferred and 30,000 shares Acoustic common—we in turn selling 300,000 shares of the De Forest Company to the Hearst interests for $200,000 cash, we agreeing with Hearst to put in $200,000 as working capital for the De Forest Company.

"I believe this, together with all the other data you have in connection with our operations and program, will enable you to talk intelligently with Mr. Reynolds, and give him our ideas in this connection.

"Yours very truly,        President"

Both Mr. Reynolds and Mr. Biddle were at Palm Beach at that time, and Mr. Bell proceeded there, and, as a result of several days' negotiations, entirely failed to interest Mr. Reynolds in the proposition put forward by Mr. Deutsch in the letter above quoted.

Mr. Biddle, however, was a friend of Mr. Reynolds of long standing, and, finally, the result of the Palm Beach negotiations was a letter addressed by Mr. Reynolds to Messrs. Biddle and Bell, under date of March 31st, making an offer entirely at variance with the Deutsch suggestion. This letter reads as follows:

"March 31st 1928

"Messrs. A. J. Drexel Biddle, Jr., Victor C. Bell, Palm Beach, Florida

"Gentlemen: Confirming the talk which we had with you this afternoon concerning the purchase by us of 600,000 shares of the no par value common stock of the De Forest Company at fifty cents per share, we are willing that you should take a one third interest in that purchase on the same basis, namely, 200,000 shares for $100,000 cash.

"You are aware that our proposal to purchase this stock is upon the condition that the receivers of the De Forest Radio Company shall be discharged and the company's property turned back to it free and clear of all judgments, suits, claims and expenses of any kind whatsoever, so that there shall be $100,000 available of the amount paid by us for working capital.

"It was further a part of our understanding that if you take this one third participation you shall have four of the nine directors, namely, yourselves, Mr. P. L. Deutsch, and Mr. Arthur Sherwood and that we shall name the remaining five Directors who will be either the men we mentioned this afternoon or men of equal standing.

"It is also further understood that if you join with us in this participation Acoustic Products Company, Inc. shall have the right to enter into a contract subject to the approval of the Board of Directors of the De Forest Radio Company to handle the managing, operating, and selling of the De Forest Products.

"Your signature on a signed copy hereof will constitute an agreement between us which will be subject to the approval of your board of Directors not later than April 9th 1928.

"Very truly yours,
"W. R. Reynolds & Company,
"Wiley R. Reynolds, President."

"Accepted subject to above provisions March 31st 1928

"A. J. Drexel Biddle, Jr.
"Victor C. Bell"

B. The substance of this letter was communicated to Mr. Deutsch by telegraph, and

on April 3d a special meeting of the board of directors of Acoustic was held, and the result of Mr. Bell's negotiations with Mr. Reynolds was laid before the directors, and, as a result, the following recitals and resolutions, inter alia, were set forth in the minutes:

"Whereas, the Company had been negotiating with Radio Corporation of America for the acquisition of a license to make use of certain patents held by that Company in connection with the production of electric phonographs; and

"Whereas, in the opinion of the Board of Directors the terms upon which such license can be obtained are wholly disadvantageous to this Company and further negotiations thereon should not be entertained; and

"Whereas, the De Forest Radio Company holds patents and licenses which, if made available to this Company, would in the opinion of this Company's engineers and patent attorneys obviate the necessity of procuring such license from the Radio Corporation of America in order to pursue its activities in the electric phonograph field; and

"Whereas, in the opinion of the Board of Directors it is vitally necessary for the Company to establish an intimate relationship with De Forest Radio Company so that such patents and licenses may be made available for its use in competing with other manufacturers in this field; and

"Whereas, W. R. Reynolds & Company is about to acquire a controlling interest in De Forest Radio Company through the purchase of 600,000 shares of its capital stock, and has, through its President, Wiley R. Reynolds made two propositions to this Company to establish such intimate relationship, which propositions have been outlined to the representatives of this Company, as follows:

"1. We are willing that you should take a one-third interest in that purchase on the same basis, namely, two hundred thousand shares for One hundred thousand dollars ($100,000). You are aware that our proposal to purchase this stock is upon the condition that the Receivers of the De Forest Radio Company shall be discharged and the Company's property turned back to it free and clear of all judgments, suits, claims and expenses of any kind whatsoever, so that there shall be One hundred thousand dollars available of the amount paid by us for working capital. It was further a part of our understanding that if you take this one-third participation you shall have four of the nine directors, namely, P. L. Deutsch, Arthur Sherwood, A. J. Drexel Biddle, Jr. and Victor C. Bell, and that we shall name the remaining five directors who will be either the men we mentioned this afternoon or men of equal standing. It is also further understood that if you join with us in this participation you may select a managing and operating organization which, however, is to be acceptable to us.

"2. We are willing to agree with you if we become the purchasers of this stock at this time that we will not sell any part of the six hundred thousand shares before the expiration of sixty days after date. We further will agree that during these sixty days we will carefully examine the general condition and especially the patent situation of Acoustic's properties which you represent with a view if everything proves satisfactory to try and work out with you an ultimate amalgamation of the interests of that Company and the De Forest Radio Company; and

"Whereas, the first of said propositions has been reduced to writing and submitted to the representatives of this Company as follows: [Here follows the letter of March 31, 1928 above quoted] and

"Whereas, said first proposition has been accepted by the representatives of the Company subject to the approval of the Board of Directors not later than April 9, 1928,

"Now, therefore, be it

"Resolved, that the President of this Company be and he hereby is directed to enter into negotiations for the acquisition of a sufficient sum of money to carry out the obligations of this Company in the event of final acceptance of said first proposition by the Board of Directors of this Company on or before April 9, 1928; and

"Resolved, that the President of this Company be and he hereby is directed to report upon such negotiations at an adjourned meeting of the Board of Directors on April 9, 1928, so that final determination can be made as to said first proposition; and further

"Resolved, that pending report of the President as provided in the foregoing resolution, the Board of Directors of this Company hereby approve of said first proposition as the best means of pursuing the activities of the Company and competing with other manufacturers in the electrical phonograph field and urge the President of the Company to direct every effort toward procuring the necessary money in order to accept the same and carry out its terms."

"This meeting was, accordingly, adjourned to April 9, 1928."

C. In this case we have, in the person of Dr. Hutchison, a diarist, to whom counsel for Mr. Deutsch has aptly referred as the Pepys of Acoustic, and, inasmuch as the crucial question here involves the domestic economy of Acoustic, i. e., the arrangements among its directors, and as Dr. Hutchison was one of its directors, his diary notes of two meetings of the board—held on April 3d and April 9th—have been admitted in this case on consent of both the plaintiff and the defendants. I think this was a very wise procedure. For these notes show the realities of the situation and indicate the background against which the records of those meetings should be read.

Dr. Hutchison's notes with regard to the April 3d meeting are as follows:

"April 4th, 1928.

"Memorandum of Matters Discussed at Meeting of Board of Directors of Acoustic Products Company 3–5.25 P. M., 4/3/28

"Deutsch stated that when the Company setup was last fall explained to Sarnoff of R. C. A., Sarnoff assured Messrs. Hammond and Deutsch that licenses would be granted to A. P. Co. for electrical recording; electrical reproduction of phonograph records, and a manufacturing license whereby A. P. Co. would make radio sets.

"A letter confirming this conversation was sent to Sarnoff who did not reply but who called up and stated that the letter was alright with one exception—that the A. P. Co. would have to buy a radio manufacturer, already licensed, or purchase the radio sets from the R. C. A.

"Subsequently, when formal license was made out and sent to A. P. Co. it was found that this license limited the activities of A. P. Co. to make only disc record phonographs for use in the home, without permission to sell same for use in hotels, theatres, or other 'public address' locations; but also licensing A. P. Co. to record electrically, etc.

"For this license they demanded a minimum guarantee of $100,000. per year on 7½% basis for all phonographs made and sold, but that if we wanted to combine a phonograph with a radio set and electrical recording, the minimum royalty would be $100,000 on radio, $100,000 on electrical phonographs and $50,000 on electrical recording.

"Not wishing to place the company's neck in such a noose, Deutsch cast about to find a way out.

"It was found that the De Forest Company owns a license to manufacture and sell radio tubes but that this right is not transferable or licensable, and the receiver of the De Forest Co. had no jurisdiction over this right; it is vested entirely in the stockholders of the De Forest Co.

"The only way out, therefore, appeared to be to buy up the stock of the De Forest Company and get control thereof. A man named Reynolds was found, who had already made the highest bid to the stockholders to take 600,000 shares of De Forest stock for $300,000 and an option on an additional 200,000 shares for $100,000.

"Out of the aforementioned $300,000, the creditors of the company on a 20% basis would be paid $175,000. leaving in the treasury of the company, $125,000.

"Reynolds endeavored to have the company thrown into bankruptcy, but was unable to do so, but if he purchases the stock, it can be done.

"Among the creditors is the Chatham and Phœnix Bank—$27,000.

"Reynolds offered to let A. P. Co. in with him on the basis of A. P. Co. putting up $100,000 against his $200,000 and to turn over the management of the De Forest Company to A. P. Co. personnel.

"Hammond stated to Sherwood that Hayden Stone and Co. had stated when H. S. & Co. took about $800,000 out of A. P. Co. treasury to pay themselves for money owed H. S. & Co. by Sonora and to pay other debts of Sonora, that if and when A. P. Co. would need additional money, H. S. & Co. would lend it or otherwise secure it for the company; and that now the time had arrived when the company needed $100,000 to take up this exceptional offer upon which the future of the A. P. Co. depended, and that he, Hammond, naturally expected H. S. & Co. to put up this money.

"Sherwood demurred in the absence of Mr. Hayden (in the office) and Mr. Hoyt (on his way to Europe), and asked that a memorandum be addressed to H. S. & Co. by Deutsch stating the present condition, and the amount of money necessary, which memorandum, he Sherwood, would put before Mr. Hayden for decision.

"It was brought out, during the meeting, by receipt of a memorandum by Deutsch

and telephone conversation from Biddle's office to Mr. Hammond, that Reynolds would gave A. P. Co. until Monday, April 9th to take up the sale of the 200,000 ($100,000) shares, and Hammond stressed the urgency of an immediate decision to which Sherwood did not respond other than as above mentioned.

"Deutsch explained that De Forest also invented regeneration which patents were owned by the De Forest Company and De Forest is proceeding against R. C. A. Armstrong patents in the Supreme Court, De Forest having won in every Court except the Lower District Court of N. Y. If Armstrong is declared the inventor of regeneration the patent will only run one year, and if De Forest is declared the inventor, the life is for 10 years. R. C. A. is licensed under the De Forest patent and could continue to manufacture regenerative sets but the Westinghouse would not be able to do so.

"A. T. & T. Co. is backing De Forest on his suits on tubes.

"Postal Co. is backing De Forest on regeneration suits.

"De Forest is suing R. C. A. under the Sherman Act on the specification made by R. C. A. that all licensees under R. C. A. must use only R. C. A. tubes. This suit has been won by De Forest in the Lower Court. The case was appealed by R. C. A. and a decision is expected in a week or so. This suit is being financed by the Radio Protective Association consisting of independent manufacturers. If De Forest wins on appeal, De Forest can license others and can then sue R. C. A. for triple damages because of the fact that this illegal restraint of trade specification of R. C. A. caused De Forest Co. to go into receivership, owing to De Forest's inability to sell tubes.

"De Forest is suing Crosley Radio for $1,500,000, which the attorney took on a contingent fee basis.

"Under the understanding with Reynolds, A. P. Co. is to take 200,000 shares from De Forest for $100,000 with a call on one third of 200,000 more on the same basis—50¢ on the dollar, and A. P. Co. will have four of the nine directors of the De Forest Company and manage same. Under this arrangement, A. P. Co. could manufacture and sell under all of De Forest's patents without paying a royalty to R. C. A.

"Reynolds telephoned the following from Biddle's office 'The deal has gone over satisfactorily' which the board took to mean that his deal with the De Forest Company had been consummated.

"When Sherwood did not consent to Hayden Stone & Co. putting up the money to buy the interest in De Forest Deutsch stated frankly that A. P. Co. would have to shut down, because A. P. Co. had not the money available to pay the cash down amount required under R. C. A. Licenses, which cash down amount would be more than enough to buy the interest in the De Forest Company, and Deutsch volunteered that he would see a group of bankers the morning of April 4th and endeavor to borrow, or sell stock to them to the extent of $1,000,000 with a call on a million dollars additional preferred and common.

"Hutchison asked for details as to outstanding stock of A. P. Co., the number of shares transferred to date for Sonora stock, and asked Sherwood on what basis Hayden Stone would dispose of their holdings, to which Sherwood replied 'I would sell out lock, stock and barrel for the net cost to us, perhaps retaining a few shares of common as our profit, as we, being bankers have no desire to engage in the phonograph business, simply to get into and get out of businesses with a profit.' 'Since the A. P. Co. situation seems to have become sour, I think our firm would be willing if we got out very reasonably to the purchaser.'

"Hutchison stated that he had been in conference with bankers for the last week or ten days, but had been unable to reach Mr. Hammond by telephone to fix a conference date to discuss A. P. Co. financing, to which Mr. Hammond replied that with the deal on with Mendes & Co. through Bristol, he did not want to bring into the picture any new people, until it was determined just what Mendes and his associates were going to do.

"The meeting adjourned at 5.25 P. M. until Monday April 9th at an hour which I did not hear.

"There were present at the meeting, Messrs. Hammond, chairman, Sherwood, Brophy, Deutsch, Keyes and Hutchison. Brophy acted as secretary of the meetings. Waivers by telegrams had been secured from the absent members of the board."

V. A. It will be noted that the key to the resolution passed on April 3d, was that Mr. Deutsch, as president, was directed to enter into negotiations for the purpose of acquiring a sufficient sum of money to carry out

the proposed purchase from Mr. Reynolds of De Forest stock as outlined in his offer of March 31st. This Mr. Deutsch tried unsuccessfully to do.

Inasmuch as Mr. Deutsch's time was short, he had prepared prior to the meeting a memorandum on the subject for Mr. Hayden, who, as a member of the banking firm most interested in Acoustic, seemed to be the most likely recourse for prompt assistance in what Mr. Deutsch regarded as a somewhat urgent situation which involved apparently Acoustic's last chance of getting a tie-up with the De Forest Company which would enable them to use the De Forest patents.

This memorandum reviewed fully the situation of Acoustic and De Forest, both from the point of view of their patent possibilities and their finances.

The fact that it might be of great value to Acoustic to acquire the De Forest Company in whole or in part was pointed out, and it was also shown, on the basis of the amount to be paid by Mr. Reynolds for the stock, that it was probable that, if any one furnished the money to buy the stock, there would only be a slight chance of not getting his money back quickly.

It was also pointed out that cash on hand in Acoustic at that time was less than $100,-000.

This memorandum had been given to Mr. Hayden on April 1st. On April 6th Mr. Hayden stated that he absolutely refused to participate in the acquisition of any of De Forest stock or to allow his firm as such to participate therein.

Attempts made to interest others were equally unavailing.

B. Meantime, on April 5th, the De Forest Radio Company had filed a voluntary petition in bankruptcy in Delaware as a part of the procedure by which old debts were to be definitely cleared up and the equity receivership in New Jersey superseded in order to prepare for the acceptance of the offer made by Mr. Reynolds to the Stockholders' Protective Committee of De Forest.

C. On April 7th Mr. Deutsch, having failed to interest Mr. Hayden, started to explore another avenue of raising the money, and telegraphed Mr. Biddle, who was still at Palm Beach, asking him to join a group, at $25,000 each, to finance the purchase of the 200,000 shares of stock which Mr. Reynolds was willing to sell out of his purchase of 600,000 shares of the stock of De Forest Radio Company to be issued.

On April 8th Mr. Biddle telegraphed agreeing to co-operate with a group in financing the De Forest purchase.

VI. A. On April 9th a special meeting of the directors of Acoustic, which had been adjourned from April 3d, was held.

The minutes of this adjourned special meeting, as far as here relevant, read as follows:

"The President reported that he was unable to complete definite arrangements to procure funds to enable the Company to accept the proposition made by W. R. Reynolds & Company through its President, Wiley R. Reynolds, in his letter dated March 31, 1928, and accepted tentatively on behalf of the Corporation by Mr. A. J. Drexel Biddle, Jr. It was announced, however, that several individuals were desirous of accepting said proposition on their own behalf and after acquiring the stock pursuant thereto, they were willing to establish an intimate relationship with this Company so as to extend to it the benefits contemplated by the acquisition of the stock itself. It was pointed out that even though the Company accepted the proposition of W. R. Reynolds & Company, these individuals would be willing to relieve it of its obligations thereunder and complete the purchase of stock as therein provided.

"After due consideration and on motion duly made and seconded the following resolutions were unanimously adopted:

"Resolved, that the action of Mr. A. J. Drexel Biddle, Jr. in accepting on behalf of this Company the proposition made by W. R. Reynolds & Company by its President, Wiley R. Reynolds, in his letter dated March 31, 1928, be and the same hereby is approved and adopted as and for the act of this Corporation, and further

"Resolved, that the proper officers of this Company be and they hereby are directed to notify W. R. Reynolds & Company of such approval and of the acceptance by this Company of said proposition; and further

"Resolved, that the proper officers of this Company be and they hereby are authorized and directed to do and cause to be done any such other and further acts and things as shall be necessary or advisable or convenient and proper for the purpose of carrying out the foregoing resolutions and the intent thereof."

B. To determine what was in the minds of the persons present at this meeting and

what was there said fortunately we are able to go beyond the minutes themselves, for we have again the benefit of a special memorandum prepared by Dr. Hutchison and sent by him within a day or so after the meeting to Mr. Hammond.

It must be borne in mind that, leaving out for the moment the position of Mr. Reynolds and his company as defendants, this litigation involves only an intracorporate, or domestic, situation, if I may so phrase it, of Acoustic.

This fact makes Dr. Hutchison's notes relevant. They are very helpful because the minutes of the April 9th adjourned special meeting seem to be somewhat inconclusive and vague in expressing the situation, whilst his notes show what really occurred at the meeting and illuminate the focal points of this cause.

Dr. Hutchison's memorandum reads in full as follows:

"Notes Taken at the Adjourned Meeting of Acoustic Products Co. at the Offices of Hayden, Stone & Co.,

"Confidential          April 9th, 1928

"1: Present, Sherwood, Deutsch, Brophy, Dows, Keyes and Hutchison.

"2: Keyes announced he had discounted Freshman Radio note for $50,000 with Chemical National Bank, leaving additional Freshman paper of about $70,000 yet to be discounted, if possible.

"3: Keyes also reported that sales inventory of Sonora had run $54,000 for January, $102,000 for February, and $200,000 for March.

"4: Sherwood had the idea, he said, that when Sonora would start selling its inventory, the sales would progress faster than they have done. Deutsch replied that Martin, to make as good a showing as possible before leaving, had done as little work as possible on radio sets to go with the combination phonograph-radio sets, necessitating a lot of work to be done before the sets could be made available for sale.

"5: Deutsch also said, with some feeling, that if H. S. Co. had left the working capital he was promised, in the treasury until Sonora could liquidate its receivables and inventory, the Company would not now be cramped for working capital; that Sonora would work into the black from said liquidation of receivables and inventory, in time, but should not be cramped for working capital just when it is trying to get into production; and that no new product would be available, now, until September, even if the company pulls through this trying period.

"6: I noticed, all through the meeting that Deutsch's attitude heretofore conciliatory towards HSCo., was quite the reverse.

"7: Deutsch related conversation had between Hayden Hammond and Deutsch at Hayden's hotel, in which Hayden said he did not care a damn what happened to APCo. and Sonora, and that he did not intend to put up another cent for these companies. He also told me, privately, that Hayden had also said he did not in any way, assume any responsibility for what Sherwood might say or had said, as far as HSCo. or its personnel is concerned; that HSCo. had not, as a Company, gone into this thing but that it was an individual operation on the part of some of the HS personnel.

"8: Deutsch reported failure on his part to raise any additional money for APCo. but that a syndicate had been gotten together consisting of Biddle, Hammond, Deutsch, Bell, Dows, whereby this syndicate had raised $87,500 and, would supply the $100,000 necessary to buy into the De Forest situation with Reynolds; but it must be understood that this money is not to be loaned to APCo. but that APCo. could benefit through the syndicate operations if APCo. meets the syndicates requirements. Sherwood did not like this setup, saying the syndicate should lend the money to APCo., taking APCo.'s note, possibly some of APCo., Preferred and Common stock, and the De Forest 200,000 shares, as collateral; and that this would be a safer proposition to the syndicate because, if APCo. does not take up the note, the collateral will be taken by the syndicate. Hutchison raised the point that APCo. preferred and common, now in Treasury, had to be issued for value and would not be fully paid and non-assessable if put up as collateral on a loan. Dows was in favor of the syndicate lending the money to APCo., but Deutsch said he had to borrow the $25,000 he is willing to put into the syndicate, and would not, under present conditions, put any more money into or lend any money to, APCo. and that neither would Hammond or Biddle. Sherwood then said HSCo. personnel would chip in their share on the syndicate, either on basis of syndicate lending the money to APCo. or as a separate deal. Sherwood asked Brophy if it would be legal for members of the Directorate of APCo. to

operate separately as a syndicate, and Brophy replied affirmatively.

"9: Keyes reported that Sonora has pressing debts which would be alleviated, to an extent, by paying out the $50,000 received from discounting the Freshman paper; but that no time should be lost in retiring the additional debts, as some of the creditors might throw the company into receivership.

"10: Keyes expressed confidence that Freshman would pull thru its threatened embarrassment.

"11: Keyes also said the Day Company (whatever that is) would pay, eventually, and that an offer has been made by Sonora to Schultz to sell him the Schultz stock of Sonora for $60,000; and that Schultz is sanguine that he will pay this for the stock. Also that if Sonora could get $50,000 in addition to the $50,000 received from Freshman paper, the creditors could be placated for a time.

"12: It is the opinion of those present that Reynolds intends making a market for De Forest stock (common) which is now selling around $4.00 a share. Sherwood wanted APCo. to get the credit due it from Reynolds' apparent profit, buying at 50¢ a share and selling at $4.00 or more. Nobody could see what he was driving at.

"13: De Forest shareholders have consented to increase of the capital stock to 1,000,000 shares, under the Reynolds plan, which they endorsed highly. Reynolds claims that as the patents are owned by the stockholders, and the receiver has no control of the patents, this deal is bound to go thru.

"14: Sherwood raised the point of legality of Reynolds, a large shareholder in De Forest present company, blocking any move that might be made, by Victor Company, for instance, which it is understood is willing to pay the creditors 30¢ on the dollar and put more money into the De Forest Treasury, for working capital, than obtains under the Reynolds plan. Sherwood thinks the Court would rule in favor of the higher return. Someone stated (I think it was Deutsch) that Reynolds is prepared to go higher in his bid, if necessary. It was brought out that if such is done, the syndicate, participating with Reynolds, would have to correspondingly increase their subscriptions.

"15: Petition to place De Forest Co. in bankruptcy was acted upon by the Court favorably last Monday, and the sale of assets —the patents excepted, of course—would possibly be made by May 1st.

"16: Reynolds is trying to show that the Victor bid is not so good for the shareholders of De Forest because Victor is doubtless acting for RCA. interests and the De Forest product would be shelved; whereas, by operating thru an independent company—APCo., the product would be put on the market.

"17: Sherwood stated we want statement in writing from Reynolds that there is or will be 1,000,000 shares in De Forest capital stock setup, of which Reynolds buys 600,000 shares for $300,000 and that the paper should also state that the syndicate participates to the extent of 33⅓% in whatever Reynolds buys in addition to the 600,000 shares, it being understood that he has option to buy 200,000 shares more than the 600,000 shares, at 50¢ per share.

"18: Deutsch called up Reynold's attorney, O. P. Metcalf, of 551 Fifth Avenue, phone M. H. 0648—stating that the option given by Reynolds expires today and that APCo stands ready to take it up. Metcalf replied that the stock could not be delivered within less than two weeks, so no payments would have to be made before that time. Hutchison inquired how an option to APCo., taken up thus, could be applied to the syndicate directly; but Sherwood said the acceptance by APCo. would tie up Reynolds and APCo. could take over the stock and turn it over to syndicate on some agreeable basis. Hutchison could not see how this can be done, but the point was passed.

"19: A telegram was ordered sent by Brophy, (Secretary) to Wiley R. Reynolds, Palm Beach, Fla., as follows: 'Board of Directors of Acoustic Products Co. has this day approved the action of its Director, Anthony J. Drexel Biddle, Jr., in accepting proposition contained in your letter of March 31st regarding participating with your company in purchasing of De Forest stock. P. L. Deutsch, President.'

"20: A general discussion of A and B Shares of De Forest Co. was entered into. The rest of the Directors seemed to know what this was about but Hutchison did not and simply made memo to effect that it thought these A and B shares will be cancelled.

"21: Deutsch explained that, if APCo. gets in on the De Forest matter, De Forest Co. will make the chassis of all parts covered by De Forest patents, will turn same

over to APCo. which will combine same with Melodon and act as selling end of combination, at the same time providing the personnel and management of De Forest Co.

"22: Deutsch said Reynolds' only object in offering APCo. the opportunity to get in on this De Forest setup is that APCo. will provide the management which Reynolds is not equipped to give.

"23: Deutsch also explained that under the De Forest patents APCo. gets regeneration, grid negative, tubes, etc., without having to pay any royalties thereon; but that the phonofilm of De Forest is a separate matter; that the man who owns the USA rights to phonofilm is anxious to tie up with APCo. and, if APCo. will get behind it, this man will put money into APCo. Deutsch is in favor of acquiring rights under the phonofilm patents which would possibly mean APCo. would manufacture all the phonofilm for this man's foreign operations.

"24: A letter was written to Metcalf, confirming phone talk with Deutsch, and sending him a copy of the telegram sent Reynolds.

"25: The meeting adjourned at 5–25 PM. Keyes left the meeting much earlier.

"M. R. Hutchison.

"Mr. Harris Hammond,
"Chairman of Board, AP. Co.,
"280 Park Ave., N. Y. City."

C. A letter was at once sent to Mr. Metcalf, attorney for Mr. Reynolds, in substantially the same terms as the telegram given in Dr. Hutchison's notes, and it was mentioned that a telegram had been sent to Mr. Reynolds. This letter to Mr. Metcalf reads as follows:

"April 9, 1928
"O. P. Metcalf, Esq., 551 Fifth Avenue, New York
"Dear Sir: I beg to advise you that the Board of Directors of Acoustic Products Company have this day approved of the action of its Director, Mr. A. J. Drexel Biddle, Jr., in accepting the proposition made by Mr. Wiley R. Reynolds, on behalf of W. R. Reynolds & Co., dated March 31, 1928, with respect to the participation with that company in the purchase of the stock of De Forest Radio Company.

"Mr. Reynolds has been advised of this action by telegram, copy of which is enclosed herewith.

"Very truly yours,
"P. L. Deutsch, President,
"Acoustic Products Co."

This letter was acknowledged by Mr. Metcalf by a letter written on April 10th, which reads as follows:

"April 10, 1928
"Mr. P. L. Deutsch, President, Acoustic Products Co., 50 West 57th St., New York City
"Dear Sir: I am in receipt of your letter of April 9th, advising me that the Board of Directors of your Company have approved Mr. Biddle's action in accepting the arrangement made between him, on your behalf, and Mr. Reynolds, on behalf of W. R. Reynolds & Company, on March 31, 1928, covering your Company's participation with W. R. Reynolds & Company in the purchase of De Forest Radio common stock.

"I observe that Mr. Reynolds has been advised of the action by telegram, of which you enclosed me a copy.

"Very truly yours,

"O. P. Metcalf."

■ VII. I have reflected much, both during the trial and since, on the situation here indicated, and I find that, in the face of Dr. Hutchison's notes just given, the plaintiff cannot successfully contend that there was not a full disclosure of the whole situation, of which it now complains, at the April 9th meeting of the Acoustic board.

It is perfectly clear to me, and I so find, that every one there present knew—(1) That Messrs. Biddle, Hammond, Dows, Bell, and Deutsch had formed a group, to which for convenience I shall refer as the Biddle Syndicate, to raise among them the $100,000 required to buy the 200,000 shares of De Forest stock offered to them by Reynolds; (2) that Acoustic did not itself have funds available for the purchase; (3) that the money raised by the Biddle Syndicate was not to be loaned to Acoustic; (4) that Acoustic was not to receive the De Forest stock unless it could pay therefor; but (5) that, in any event, if the purchase was carried through, Acoustic was to have four out of nine directors on the De Forest Board, and thus be in a position to secure as close a relationship with De Forest as could be secured by such minority representation thereon; (6) that the acceptance of the Reynolds' offer by Acoustic, viewed from its domestic situation, was nominal only, and merely for the purpose of maintaining its corporate front intact vis-à-vis Reynolds for the time being in the hope that its financial condition might become better; and (7) that further corporate action thereon was not contemplated as necessary.

VIII. A. The first payment on account to Reynolds for the purchase of De Forest stock was made on April 24th and a receipt was given by W. R. Reynolds & Co. addressed to the Acoustic Products Company.

That receipt was forwarded by Mr. Metcalf to Mr. Deutsch, and reads as follows:

"W. R. Reynolds & Company
"Jackson, Michigan

"April 24, 1928

"Acoustic Products Company, Inc., 110 West 57th Street, New York City, N. Y.

"Dear Sirs: We acknowledge receipt this day from you of checks of Elise Hammond for $12,500, A. J. Drexel Biddle, Jr. for $25,000 and Percy L. Deutsch for $16,000, aggregating $53,500, representing one-third of the sum of $160,500, which we are furnishing as a deposit in the United States District Court for the District of Delaware on the composition proposed by De Forest Radio Company to its creditors. The De Forest Radio Company is to issue to our order its Five Year 6% Convertible Notes, convertible into no par value common stock at any time at the option of the payee or holder at the rate of two shares of stock for each dollar of the face amount of the note. The notes are to be delivered to us when the composition in bankruptcy has been confirmed, and on receipt of the note representing the amount of the above checks, we will endorse the same to you without recourse and deliver it to you. This payment which we are making is on account of the total of $300,000, which we offered to pay for convertible notes or stock in our offer to the Stockholders' Protective Committee of the De Forest Radio Company, dated January 18, 1928, of which you have a copy, and the above checks for one-third of that amount are for your account in accordance with our letter of March 31, 1928, addressed to your director A. J. Drexel Biddle, Jr., and to Victor C. Bell, accepted by them the same day, and ratified by your Board of Directors April 9, 1928.

"If the composition in bankruptcy be not confirmed, we will return to you the amounts of said checks when, as and if the amount deposited by us is repaid to us by the United States District Court for the District of Delaware, and we will likewise return said amount to you if our deposit is not accepted in the bankruptcy proceedings, or is not made for any other reason."

"Very truly yours,

"W. R. Reynolds & Company
"Wiley R. Reynolds, President."

IX. It is noteworthy that in Mr. Reynold's letter receipt is acknowledged, not of checks made or moneys paid by the Acoustic Products Company, but of checks from Mrs. Elise Hammond for $12,500, from Mr. Biddle for $25,000, and from Mr. Deutsch for $16,000, aggregating $53,500, representing the Biddle Syndicate's one-third share of the first payment required.

I have found that Dr. Hutchison's memorandum showed that none of the money assembled by the Biddle Syndicate which was to be used for the purchase of the De Forest stock was to be loaned to the Acoustic Products Company.

I now find that the fact that Reynolds was paid by direct check of the several participants in the Biddle Syndicate, as is shown by his receipt, overrides the receipt by Mr. Deutsch in the name of the Acoustic Products Company for Mr. Biddle's check for $25,000. I do not think that such a receipt could be allowed to vary a situation that is so clearly shown both by contemporaneous documents and evidence given at the trial.

X. So far as its finances were concerned, the condition of Acoustic was getting worse day by day. The figures in Exhibit 184, from January 1st to May 31st, show that both the cash on hand and the inventories—concededly outmoded but a source of some return on sale—were dwindling steadily.

The amount of cash fell from $637,437.96 on January 1, 1928, to $41,808.70 on May 31, 1928. During the same period the inventories dwindled steadily, save for a slight rise during January, from $911,548.20 to $683,626.03, and the accounts receivable decreased from $477,922.36 to $267,418.91.

There was, of course, the continual drain of a heavy overhead for salaries and rent. It was only by selling its inventory and cashing in on its receivables that Acoustic could keep going, and, while it did this, it was running lower and lower in cash.

A fair summary of the situation is that Acoustic was living off its own fat.

It had not good credit. Mr. Hoyt of Hayden, Stone & Co. testified that it was not a good credit risk for a bank loan of $100,000, or any other substantial sum.

It had run down financially from the time of its organization in December, 1927. Indeed on May 21, 1928, Hayden, Stone's representative on the board seriously suggested the necessity for dissolution and liquidation of Acoustic, because it was, ap-

988

parently, about to run completely short of money.

The Mendes financing, which was under discussion during May, was still in the future, and until it was closed on June 6th was not assured.

The money for the De Forest stock had to be paid when Reynolds called for it, and the bankruptcy composition in Delaware was waiting for a ruling by Judge Morris on the specifications which had been filed therein.

XI. As noted above, after it had become obvious that an equity receivership in the New Jersey court was not the best method by which to get rid of all the liabilities of De Forest, as Reynolds required, it was decided to file a voluntary petition in bankruptcy in the United States District Court for the District of Delaware—the De Forest Radio Company being a Delaware corporation—and thus to supersede the equity receivership, and then to make a composition in the bankruptcy court with De Forest creditors.

By such a proceeding only was it possible to be certain of complying with the terms of Mr. Reynolds' offer.

The first meeting of creditors was held on April 28, 1928, at Wilmington, Del., and the necessary deposit made, and, although the composition was approved by majority of number and amount of creditors, specifications were filed by minority creditors and set down for argument. On the 24th day of May, 1928, the specifications were overruled and the composition confirmed.

Thereupon the necessary amendment to the De Forest certificate of incorporation to change the capital structure of De Forest to meet Reynolds' requirements was filed with the Secretary of State of Delaware and the additional amount necessary to complete the composition became payable into the bankruptcy court.

The plaintiff's contention that the Biddle Syndicate should have secured a delay on this payment, pending the outcome of the Mendes financing by which it was hoped to put Acoustic in funds, is without persuasive force to me. Reynolds had to look to his own situation vis-à-vis De Forest Stockholders' Protective Committee, and he was merely selling part of the stock which he hoped to buy from that committee. He was a third party—at arm's length with the lot of them—and he was dealing with a Court of Bankruptcy. Certainly that was not a situation in which a further delay could have been reasonably demanded by the Biddle Syndicate or expected by Mr. Reynolds.

XII. On May 25, 1928, the final payments were made by the then participants in the Syndicate, namely, Biddle, Bell, Deutsch, Hammond, Stein, and White, and, at the time this payment was made, Mr. Reynolds was advised both by Mr. Biddle and Mr. Hammond that the Acoustic Company was unable to get money to buy the De Forest stock, and that therefore it was being bought by the syndicate instead.

Thereupon Mr. Reynolds wrote to the De Forest Company a letter, dated May 25, 1928, instructing them how the certificates or shares which he was purchasing should be divided.

That letter reads as follows:

"May 25, 1928.
"De Forest Radio Company, Jersey City, N. J.

"Dear Sirs: Will you please issue certificates for six hundred thousand (600,000) shares of your no par value Common Stock in accordance with our offer of purchase of January 18th 1928 in the following names and amounts:

| | Shares |
|---|---|
| Victor C. Bell | 50,000 |
| A. J. Drexel Biddle, Jr. | 50,000 |
| P. L. Deutsch | 55,000 |
| Harris Hammond | 25,000 |
| O. P. Metcalf | 1 |
| W. R. Reynolds | 1 |
| Seal & Co. | 399,997 |
| Adam Stein, Jr. | 10,000 |
| A. B. Westervelt | 1 |
| Malcolm White | 10,000 |
| Total | 600,000 |

"Very truly yours,
"W. R. Reynolds & Co.,
"By ———— President."

Reynolds & Co., of course, gave separate receipts to each of the members of the syndicate for the full amount received from each.

On May 25th an agreement was also entered into by Reynolds & Co. with the syndicate reciting that the members of the syndicate were the owners of 200,000 shares of De Forest Radio Company stock and the Reynolds Company and its nominees the owners of 400,000 shares, and providing that Reynolds & Co. would make a market on the Curb Exchange for 60,000 shares and sell them at not less than $10 per share.

XIII. The subsequent history of Acoustic is not, I think, worth giving in detail, for the decision of this cause turns on what happened in the period with which I have dealt and the financial situation then existing.

It will, therefore, suffice for the purposes of this opinion to say: (1) That, in order to comply with the requirements of the Curb Exchange as a condition precedent to listing the De Forest stock thereon, the purchasers thereof had to find in June, 1928, $600,-000 additional to finance De Forest; (2) that all the participants in the purchase of the De Forest stock profited—some very largely—by the later sales thereof, and that it is for this profit as having arisen from the breach of their several alleged fiduciary relationships to Acoustic that the accounting is sought in this cause; (3) that Acoustic was given a representation of four directors on the De Forest board; and (4) that, after a battle royal within that board, they were unable to secure such a contract with De Forest for Acoustic as they desired, although they did succeed, on September 20, 1928, in making a nonassignable five-year cost plus contract with De Forest, terminable in the event of bankruptcy or permanent receivership of Acoustic, for Acoustic's requirements in parts and apparatus embodying De Forest's patents in the radio, phonograph, sound or other reproducing or receiving fields; and (5) that, although refinanced by a syndicate formed under the management of Mendes & Co. in June, 1928, and further assisted by a credit granted by Hayden, Stone & Co. in the latter part of 1928, Acoustic failed to make a commercial success, and went into bankruptcy in December, 1929.

XIV. Often, perhaps usually, the facts in equity causes fall into well-recognized and easily ascertainable patterns, but occasionally a cause comes to trial which is unique, and involves, in effect, an adventure in analysis. Such an one is this.

In dealing with a cause of this kind, it is of the essence that the trial judge should be realistic in chancering the facts. He must look behind the surface appearance thereof and discover, if he can, the actualities which underlie that appearance.

XV. A. It has always seemed to me that in any somewhat anomalous situation, such as we have here, the contemporaneous attitude of the interested parties, whether involving action or inaction, is the most significant evidence imaginable of the actualities of that situation. Cf. Harris v. Morse (D. C.) 54 F. (2d) 109, 115.

Here we have the fact that Hayden, Stone & Co. still had in April and May, 1928, the largest stake in the company, and that, through its representative on the Acoustic board, Mr. Sherwood, they knew of the acceptance of the Reynolds offer, nominally at least, by the corporation, and that the delivery of the De Forest stock would probably have to be made within a fortnight. Yet, on April 9th, neither Hayden, Stone & Co. or Mr. Sherwood made any claim that it should be delivered to the corporation.

After the De Forest stock was later paid for and taken by the Biddle Syndicate, although Hayden, Stone & Co. still had a director representing them on the Acoustic board, and negotiations with De Forest were proceeding for weeks for a contract involving the use of its patented devices, there never at any time was any assertion made by Hayden, Stone & Co. or their director representing them that Acoustic had any right to the De Forest stock, or to the profits made from the sale of a part thereof by the Biddle Syndicate.

It is perfectly fair, moreover, to assume that the price of the De Forest stock on the Curb Exchange, as a result of the artificial market for a limited number of shares which Mr. Reynolds was fostering, was known to Hayden, Stone & Co., for they conducted a large brokerage office and were constantly in touch with the security markets.

When these circumstances are considered, in addition to Dr. Hutchison's memorandum notes of the meeting of April 9th, the trier of the facts finds his mind almost irresistibly driven to the findings regarding the April 9th meeting which have been hereinabove made.

B. The finding above made that the real situation was known to everyone at the April 9th meeting exorcises any claim that at the time when the arrangements, of which complaint is here made, were consummated, there was any failure in disclosure by, or disloyalty to the corporation on the part of, the several directors here sued.

Furthermore, it seems to me clear, as above indicated, that it was thoroughly understood at the April 9th meeting that the matter was then finally disposed of, and that, if the Biddle Syndicate bought the stock, they would not be buying it in derogation of the company's right in a field which it had explored, or in an effort to exclude it from that field, but that the members of the Biddle Syndicate, if they bought the stock, would be

spending their own money in order to secure for Acoustic what was regarded by all as an advantageous, if not a necessary, objective, which Acoustic itself was not financially in a position to achieve.

It was for this reason that I stated during the trial that, if there was a conspiracy here, it was a conspiracy of salvors, not of a conspiracy of pirates. My further careful consideration of the record has not caused me to change the point of view then indicated.

■ C. It seems to me that, so far as the result of this cause is concerned, however, it is immaterial whether the nominal acceptance of the Reynolds offer of March 31st by Acoustic be considered to have created a relation of buyer and seller between Reynolds and Acoustic or not, because Acoustic was not financially able to avail itself of any legal or equitable right which might have arisen in its favor by that acceptance.

The financial inability of Acoustic to perform any contract which it may have had with Reynolds is as clear as a fire on a hill at night, and constitutes an insurmountable obstacle which lies athwart the plaintiff's attempt to make out a cause of action here, because that financial inability to perform was an inherent infirmity of Acoustic which precluded it from claiming any equity which it might otherwise have had in its De Forest objective, and left that objective open to any one who might be in a financial position to achieve it even if he had originally occupied a fiduciary relation towards Acoustic.

XVI. The situation of Acoustic on April 9th was very well stated by Mr. Pickering, of counsel for the defendants, in his argument. He said: "When we arrive at the place where the circumstances immediately involved here come into the picture, the enterprise was still a failure. It had not prospered. The new Company was inadequately financed. Changes in the field of sound reproduction had rendered its inventory largely obsolete. It was not in a position to manufacture products which called for patents or patent rights which it did not have. It had no new products on the market. It was liquidating its old inventory at a loss. It was practically out of the trade and operating at losses of from $50,000 to $100,000 a month. Obviously, it was at the end of its trail."

A. For a company in such financial difficulties as Acoustic thus found itself in April and May, 1928—poised by all omens on the edge of an equity receivership and possibly headed for liquidation in the bankruptcy court—to contemplate a purchase with corporate funds, if any had been available, of a minority interest in a company like De Forest, which had long been in an equity receivership and was then in bankruptcy, as a possible road to a reorganization after composition, seems in the light of to-day to be an act of egregious folly from any standpoint. Even then every one to whom Mr. Deutsch turned for aid seems to have held this opinion.

Indeed, Mr. Hayden absolutely refused to consider going into the matter even on the basis of buying the De Forest stock for himself or together with members of his firm on the same general basis afterward agreed to by the Biddle Syndicate.

But Acoustic was in desperate straits; it had not the necessary funds; it had not the necessary credit to secure such funds. In order to give it any hope of commercial success, something had to be done to achieve its De Forest objective, i. e., the contact with De Forest necessary for use of De Forest patent rights and a substantial minority representation on the De Forest board of directors which could press for the best arrangement procurable as to the use by Acoustic of those rights.

■ B. That is the background of the meetings of April 3d and April 9th, and against that background I may read the Hutchison memoranda thereon as well as the minutes of those meetings. Zeckendorf v. Steinfeld, 225 U. S. 445, 457, 458, 32 S. Ct. 728, 56 L. Ed. 1156.

Thus read, it seems to me clear that the acceptance of the Reynolds offer by Acoustic was, realistically viewed, a mere gesture valuable for window dressing perhaps, in case new financing were sought, but, owing to Acoustic's financial condition, wholly valueless to Acoustic itself, looked at either from the point of view of securing ownership of the stock or of its main objective—a patent contact.

The minutes of the April 9th meeting adumbrate the fact that Acoustic's ability to implement its acceptance was more than doubtful, and Dr. Hutchison's notes make it clear that all there present understood the whole situation and realized the illusory nature of the corporate act.

In any event, all felt that a corporate acceptance would hold Reynolds, and realized that, if the company could not raise the money to implement its contract, some of its di-

rectors, i. e., the Biddle Syndicate, would see the company through to its patent objective and its minority representation on the De Forest board, though they would not lend it the money to put itself through.

Therefore, up through the first payment to Reynolds—made with the funds of individuals—the whole situation was dealt with vis-à-vis Reynolds, but not domestically between Acoustic and its directors or among those directors, as a company affair.

Then, when the second payment was due on May 25th, and the company's cash and credit position remained such that it could not purchase the De Forest stock, the individuals who had stood in the background ready, willing, and able to help came forward, paid the balance due for the second payment to Reynolds, and advised him that the company was not in position to perform, but that they would perform personally and take the De Forest stock for which they had already made part payment via the corporation with their own funds.

All the money paid on both occasions, it must be remembered, was the money of the syndicate—not a cent of it had ever gone through the company's books.

Thereafter Acoustic's objectives were secured as far as possible—quite as far as would have been possible if the company had been able to buy the stock. Four of Acoustic's representatives went on the De Forest board, and, after a long fight in Acoustic's behalf, succeeded in securing from the De Forest board the requirement contract above mentioned.

Now, I am asked as an equity judge to allow the letter of the resolution of April 9th override these actualities. I cannot bring myself to do it, for I feel it would stultify common sense.

■ C. Of course the directors of Acoustic were fiduciaries; of course they were precluded from purchasing in derogation of the corporation in any field in which they knew that the corporation was interested and which it was able to enter.

But they were not under any duty to lend their own money to Acoustic, Teller v. Tonopah & G. R. R. (C. C.) 155 F. 482, 483, 484, nor, as will be hereafter shown, to stay out of a field in which Acoustic was not financially able to enter.

■ Proximate cause operates here as it does in other branches of the law. To make a man liable in equity as well as at law, an act of his must have caused the injury of which the plaintiff complains.

Acoustic was not prevented from purchasing the De Forest stock which Reynolds agreed to sell to it by any breach of duty on the part of its directors but by its own inherent infirmity. They gave it every chance, and acted only after that infirmity was clear and, obviously, not then at least, remediable.

Whatever may have gone before, its financial infirmity was the proximate cause of Acoustic's being unable to achieve the purchase of De Forest stock, and for that infirmity the directors here sued are not shown to have been in any way legally responsible.

■ XVII. A. To found the right to an accounting against a fiduciary for having himself secured an objective claimed by his cestui, it is necessary to show by a preponderance of the evidence that it was the act of the fiduciary which was the proximate cause of the prevention of his cestui from achieving his objective.

The cestui must show that he was ready, able, and willing to take over the objective or else he fails, for, if he was not ready, able, and willing to do so, the failure to attain the objective was due in the eyes of equity to his own fault. He himself is the proximate cause of the failure, and the fiduciary is freed from his ordinary fiduciary responsibilities in regard to that objective by the cestui's inherent infirmities.

A cestui cannot properly be allowed to take the position of a dog in the manger. Such an attitude would run counter to all equitable principles and all practical considerations.

This is a world of realities, and if, through his own disabilities, the cestui cannot enter a field which in the absence of such disabilities equity would—so far as his fiduciaries are concerned—regard as his alone, there remains no reason whatever for maintaining an exclusion of the fiduciary therefrom.

■ There is not any such rule in equity as "once a fiduciary always a fiduciary."

■ For, when a fiduciary obligation exists, it is an attribute of a substantive right in personam, cf. Harris v. Morse (D. C.) 54 F. (2d) 109, 112, and may, like any other relationship of that sort, be terminated in various ways, leaving the parties in the status quo ante. For example, it may be ended, inter alia, not only by voluntary abdication of the cestui, cf. Harris v. Morse (D. C.) 54 F.

(2d) 109, 115, but also by frustration of subject-matter, cf. Harris v. Morse (D. C.) 54 F.(2d) 109, 114; Harris v. Umsted, 79 Ark. 499, 96 S. W. 146, 147; Commercial Bank v. Weldon, 148 Cal. 601, 84 P. 171, 174, 175, and by inability, for any reason financial or otherwise, on the part of the cestui to achieve his objective. Authorities infra.

■ B. The principle that an equity is cut off if financial inability to perform a duty or avail of a right intervenes between the plaintiff and the equity which he invokes, and is the proximate cause why that equity may not be availed of is not new, although, heretofore, it may not have been expressed in exactly this way.

It is, for example, implicit in Lord Chelmsford's celebrated decision in De Mattos v. Gibson, 4 De Gex and Jones, 276, 300, 301 (1859), and in Mr. Justice Hill's decision in the case of The Lord Strathcona, 1925, Prob. 143, 156, 22 Lloyd's List 368, 371, which followed Lord Chelmsford's decision.

In De Mattos v. Gibson, 4 De Gex and Jones, 276, one Curry was the owner of the steamship Allerton. He had chartered that vessel to the plaintiff De Mattos for a voyage to the Suez Canal with a cargo of coal from the Tyne. Subsequent to this charter party Curry mortgaged the vessel to Gibson for £1,500. The mortgage was taken by Gibson with full notice of the charter, and the money was advanced in order to enable Curry to perform the charter.

The Allerton sailed with her cargo, met bad weather, suffered damage, and had to return to port. She repaired at her owner's expense, sailed again, sprung a leak, and returned to Penzance in Cornwall, where her cargo had to be discharged in order that she might be repaired. Her owner, however, had not funds to repair her again.

The mortgage having by that time fallen into arrears, Gibson sought to foreclose his mortgage; and De Mattos, the charterer, brought a bill of equity to restrain Curry, the owner, and Gibson, the mortgagee, from interfering with the performance of his charter party.

The case came on thus:

First a motion for an interlocutory injunction made before his Honor Vice Chancellor Wood was refused. On appeal from this decision, an interlocutory injunction was granted by the Lord Justices on the ground that the charterer had the superior equity owing to the notice of the charter which had been given to the mortgagee.

On final hearing, the case came again before the Vice Chancellor, who dismissed the bill.

On appeal from the Vice Chancellor to the Lord Chancellor, Lord Chelmsford, the latter, held that the shipowner's financial inability to perform the charter party cut off any equity on the part of the charterer to prevent the mortgagee from foreclosing on the ground that the act of the mortgagee was not what was preventing the performance of the charter, for that had already been prevented by the shipowner's financial situation.

Lord Chelmsford, therefore, dealt with the case on realistic grounds and said (4 G. & J. at page 300):

"In order to entitle the Plaintiff to an injunction against Gibson, he must shew that Gibson has done, or threatened to do, some act which has interfered with the performance of the contract of which he had had notice. But does anyone believe that, if Gibson had not interfered at all, Curry could possibly have effected the repairs and enabled the vessel to proceed to sea? If not, how can it be said that Gibson has done anything to hinder a voyage which had been completely stopped by Curry's utter inability to put the vessel in a condition to perform it, before any active interference by him?

"I think that, under these circumstances, it would be most unjust to restrain Gibson from availing himself of any rights which his possession of the vessel and his title as mortgagee have enabled him to exercise.

"It is only necessary to advert to the question of the possible equity which the Plaintiff might derive from Curry, to prevent Gibson's doing any act to hinder Curry from performing his contract, for the purpose of dismissing this question in a word. How could Curry succeed in restraining Gibson from exercising any right as mortgagee, and thereby interfering with the performance of a contract which Curry was wholly incapable of performing? No equity could possibly exist between Curry and Gibson under such circumstances, and therefore the Plaintiff can derive no benefit in this manner through Curry against Gibson."

The Vice Chancellor's decree dismissing the bill of complaint was, accordingly, affirmed.

The same question came up in The Lord Strathcona, 1925 Prob. 143, which was really an equity case tried in the admiralty court, and with which I am very familiar, because I represented the mortgagee from the issuance

of the writ through the sale of the vessel under final decree. In that case Mr. Justice Hill took the same position as had been taken by Lord Chelmsford. Because the owner of the Lord Strathcona did not have money enough to continue with the performance of his charter party, Justice Hill held that a mortgagee who had accepted his mortgage with knowledge of the charter party, and therefore, under British law, in subordination thereto,[1] could foreclose his mortgage because his so doing did not interfere with the performance of the charter party which already had become incapable of performance, as the owner had neither cash or credit to go on with it.

Those were cases, as will be noted, where the equity was cut off by the financial inability of a third person to perform his part in a three party situation.

Cases involving facts more like the situation here, in which the same principle is involved, are Murray v. Vanderbilt, 39 Barb. (N. Y.) 140, 156, 157; Hannerty v. Standard Theater Co., 109 Mo. 297, 19 S. W. 82, 84; Jasper v. Appalachian Gas Co., 152 Ky. 68, 153 S. W. 50, 55, Ann. Cas. 1915B, 192; Grand Amusement Co. v. Palladium Amusement Co., 315 Mo. 907, 287 S. W. 438, 441.

Assuming, therefore, for argument's sake, that the plaintiff's principal contentions are justified, the highest point at which the plaintiff's case against the directors of Acoustic here sued can possibly be put is that it has, if I may so express it, suffered only an injuria absque æquitate.

But I do not put the plaintiff's case as high as that, for it seems to me clearer and clearer, as I reflect on it, that, looking at all the circumstances surrounding the resolution by Acoustic of April 9th accepting the Reynolds offer—as I am properly entitled to do, Zeckendorf v. Steinfeld, 225 U. S. 445, 457, 458, 32 S. Ct. 728, 56 L. Ed. 1156,—the plaintiff has failed even to make out an injuria for the reason that its case does not sound in actuality.

This disposes of the claim that the director defendants are liable to account.

XVIII. I turn now to the claim of the plaintiff against Wiley R. Reynolds and W. R. Reynolds & Co.

---

[1] On the charterer's equity under British law, see the case of the Lord Strathcona S. S. Co., Ltd., v. Dominion Coal Co., Ltd., 1926 App. Cas. 108, 118, 123, which approved the views thereof expressed in De-Mattos v. Gibson, 4 De Gex & J. 276, and affirmed in this regard a case which I argued in the Supreme Court of Nova Scotia—reported 57 Nova Scotia 113 (1923)— and appealed thence to the Privy Council.

As I understand it, there is not any differentiation made between these two defendants by their counsel, but, of course, so far as Mr. Reynolds' personal liability is concerned, he would stand, I think, on just the same footing as Mr. Mendes, namely, that he did not act in his relation with Acoustic outside the scope of his authority as president of W. R. Reynolds & Co. Therefore he could not in any event be personally liable.

On analysis of the situation as between W. R. Reynolds & Co., hereinafter called the Reynolds Company, and Acoustic, it is seen that, if the acceptance by Acoustic of the Reynolds Company offer of March 31st is considered to have created what we called during the trial a substantive right in personam between Acoustic and Reynolds Company, it did not create a relationship which put the Reynolds Company and Acoustic in quasi partnership as coadventurers for the purpose of securing the new De Forest stock and dividing it between them on a one-third and two-thirds basis.

For, although the letter of March 31st from Reynolds & Co. to Mr. Biddle and Mr. Bell spoke of a "participation" of one-third by them or Acoustic in the purchase of the De Forest stock which Mr. Reynolds had an agreement to buy, the surrounding circumstances show that this letter is not the offer of a coadventure, but merely an offer by the Reynolds Company to sell to Acoustic 200,-000 shares of the 600,000 new De Forest shares which it had agreed to buy from the De Forest Stockholders' Protective Committee, if and when they were issued.

The use of the word "participation" in this offer of March 31st is really the sole conceivable basis for the claim that a relationship of coadventure arose by reason of Acoustic's acceptance thereof by the Reynolds Company. But the circumstances show that this word "participation" was merely a somewhat grandiose word for sell, and that the offer was to sell a part of the stock which the Reynolds Company hoped to buy from the De Forest Stockholders' Protective Committee.

In this connection these facts are observable:

It is common ground that it was a matter of entire indifference to Mr. Reynolds whether he dealt with Mr. Biddle and Mr. Bell, or with Acoustic, provided that the money was paid for the 200,000 shares when it was asked for, and provided also that Mr. Biddle came on the De Forest board of directors when Mr. Reynolds secured the controlling

stock. But, as Mr. Reynolds did not know much about Acoustic from the first, he was chary of dealing with it direct.

In a coadventure delectus personæ is of the essence as in a partnership. In a sale for cash it matters not with whom one deals, and the proposal which the Reynolds Company offered to Acoustic was a sale for cash.

In this case, on March 31st, the Reynolds Company and Mr. Reynolds had the whole situation in their own hands. The Reynolds Company had made its offer to the De Forest Stockholders' Protective Committee, and the members of that committee had to take such steps as would enable them to accept the offer in accordance with its terms.

This they had agreed to do in January, and the legal machinery was set up whereby the Stockholders' Protective Committee might implement its part of the agreement thus formed.

There was not anything for Mr. Biddle or Mr. Bell (or Acoustic) to do except to pay the money for their 200,000 shares of De Forest stock when called on.

There was not any mutual effort on the part of Reynolds, Biddle, and Bell or Acoustic contemplated to reach any objective, for the objective had been reached already by Reynolds Company. There was not any agreement on the part of Acoustic to share expenses or to advance money before the shares were ready for delivery. Cf. Harle v. Brennig, 131 App. Div. 742, 116 N. Y. S. 51.

What really happened was merely that the Reynolds Company agreed to sell to Acoustic 200,000 of the new De Forest stock for the same amount as it was paying for it.

Moreover, it is not possible for the plaintiff to fall back on any equity which might be involved in a contract which a court would order to be specifically performed. For a contract for the sale of a minority interest in a company whose stock was dealt in or was to be dealt in on an exchange would not be subject to specific performance in equity, and, consequently, if there was a contract between the Reynolds Company and Acoustic, and if the Reynolds Company through the act of its president broke that contract, the only proper form of remedy for Acoustic and its trustee in bankruptcy would be an action for damages at law for breach of contract against the Reynolds Company; and not an action for an accounting based on any theory that the Reynolds Company occupied a fiduciary relation of any kind toward Acoustic.

I think, therefore, to sum it all up, that the Reynolds Company and Mr. Reynolds were outside third party interests, entirely at arm's length with Acoustic and its directors, and, consequently, that there cannot be any recovery in this case against the Reynolds Company owing to the acceptance of its offer by Acoustic, and a fortiori not against Wiley R. Reynolds, who was not a party thereto.

XIX. In view of the fact that the candor of all the director defendants has been attacked, and their loyalty to Acoustic has been questioned in this cause, it has seemed to me best to decide this case on the merits involving those issues and not to deal with it—even where it could be so dealt with—solely from the point of view of the technical defense of a release.

But I must not leave the case without mentioning this aspect of it, for there is a general release in the case which would be an insuperable bar to any recovery from Mr. Deutsch herein, even if the other considerations above mentioned were lacking.

The situation with regard to this general release was that on July 7, 1929, Mr. Deutsch, having come to disagreement with the other then directors as to the policies of the Sonora Products Company, the new name of Acoustic, resigned his position as president.

At that time the Sonora Products Company, hereinafter called Sonora, owed Mr. Deutsch considerable money for advances which he had made in an attempt to help out the situation.

On the 25th of July, 1929, claims were made on Sonora by Mr. Deutsch for these advances which totalled, approximately, the sum of $36,000. Finally, on October 22, 1929, having been unable to get any satisfaction owing to the contention by Sonora that it had claims against him, Mr. Deutsch began an action against Sonora to secure the return of these advances.

This action was resisted, and counterclaims were interposed by Sonora. After some negotiations, on November 26, 1929, a written agreement of settlement was reached whereby Mr. Deutsch agreed to take $20,000 in settlement of his claim for $36,000, provided general releases were exchanged between him and Sonora.

In pursuance of this agreement, $20,000 was paid to Mr. Deutsch and general releases

were executed and delivered by each party to the other. The plaintiff now claims that at the time when the releases were given the parties then in control of the Sonora were not aware of the De Forest stock transaction, which is the gravamen of this suit, and hence that transaction could not be considered as having been included within the ambit of the general release given to Mr. Deutsch by Sonora.

It seems to me that this contention is wholly wrong. I find that the general release was properly executed by the president of Sonora with due authority from the board of directors thereof, and, consequently, that it released Mr. Deutsch from any liability existing up to that time to the company. Sonora could not go it blind on the settlement and then, if and when another claim was found, bring it forward in the face of a general release. Cf. Atwater v. Guernsey, 254 U. S. 423, 424, 41 S. Ct. 150, 65 L. Ed. 339, affirming In re Atwater, 266 F. 278, 281 (C. C. A. 2); Houston v. Trower, 297 F. 558, 560–562 (C. C. A. 8); Harbeck v. Pupin, 145 N. Y. 70, 80, 39 N. E. 722.

I do not feel, however, that the general release to Mr. Deutsch effected the release of the other party defendants, because what occurred here, even on the plaintiff's theory, did not involve a derivative tort as where an employer and employee are both sued for negligence, nor did it involve really a joint tort in any proper sense of the word. I think that the most that can fairly be said is that the equitable claims and the liability therefor, if any, were several, and, inasmuch as Mr. Deutsch is the only party defendant who secured a release of any kind, the case against the others must stand solely on my decision on the merits without the unnecessary aid of this technical defense.

XX. This case took twenty-five court days to try. It dealt with a subject-matter which was fraught with most disagreeable implications against the defendants. Furthermore, the plaintiff's counsel had to prove his case largely by their evidence. Yet, although he pressed all his points home, he was so tactful and polite and the defendants and their counsel were so sportsmanlike in their attitude that there was not the slightest evidence of bad feeling on either side during the trial. It was, therefore, a great pleasure to me to preside thereat, and I feel that, after such a long and agreeable court contact with the counsel and the parties involved herein, I should be forgetful of my manners if I did not, as I now do, express to them all my appreciation for one of the most interesting and pleasant judicial experiences which I have had.

XXI. There will not be any costs to the defendants in this case.

As trustee in bankruptcy, the Irving Trust Company was fully justified in commencing and prosecuting this suit after learning what it felt had been discovered from the documents in the company's files and by the examination of the defendants under section 21a of the Bankruptcy Act (11 USCA § 44(a). In a situation like this, a trustee in bankruptcy should be able to feel that it can bring an action without the danger of having costs granted against it.

XXII. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, title 28, U. S. C. § 723 (28 USCA § 723), and I will sign an order so providing. Harris v. Morse (D. C.) 54 F.(2d) 109, 116, 117; Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; The El Sol (D. C.) 45 F.(2d) 852, 856, 857; Briggs v. United States (C. C. A.) 45 F.(2d) 479, 480.

Such an order and a decree dismissing the complaint without costs may be presented for my signature on the usual notice to plaintiff.