GRAND AMUSEMENT COMPANY, Appellant, v. PALLADIUM AMUSEMENT COMPANY, RUTH E. LUND, BERNHARD SCHRAND and CHARLES E. KNUEPPEL.

Division One, October 11, 1926.

1. CORPORATION: Correct Accounts: Insolvency: Disbursements: Lost Records. The officers and directors of a corporation are in a sense trustees, and as such it is their duty to keep correct accounts and to be able to make a full and correct showing of its receipts and expenditures; but where through the lapse of time and the loss of records they are unable to render a bookkeeper's account of the disbursements made of its funds, it cannot be held that such funds were on a given date still on hand, in the face of evidence which on the whole convincingly shows the contrary.

2. ———: **Foreclosure of Mortgage: Money on Hand to Meet Debts.** It cannot be held that a corporation had on hand sufficient funds and credits to have enabled its board of directors to pay all debts, at the time a deed of trust on its leasehold was foreclosed to meet a past-due debt, and the property was sold to four of the directors, who either put up money of their own or borrowed money with which to buy it, where all its funds on hand and available credits were not sufficient by half to satisfy the demands of creditors who were clamoring for payment, and such purchasers in good faith exhausted every available resource in an effort to meet the payments due and required to be paid by the deed of trust; and particularly so, where all the other stockholders were offered a full opportunity to protect their interests in the same way that the purchasers did theirs, and the foreclosure sale was conducted openly, regularly and in conformity with the terms of the instrument, and after all the stockholders knew and had known for sometime that it did not have money on hand to meet its past and accruing current debts.

Corpus Juris-Cyc. References: **Accounts and Accounting,** 1 C. J., Section 129, p. 643, n. 15.  **Corporations,** 14 C. J., Section 1471, p. 947, n. 26; 14a C. J., Section 1866, p. 97, n. 58; p. 98, n. 59; p. 99, n. 74; Section 1881, p. 114, n. 58; Section 1928, p. 152, n. 30; Section 1943, p. 163, n. 85.

Appeal from Circuit Court of City of St. Louis.—*Hon. Frank Landwehr,* Judge.

AFFIRMED.

*H. W. Femmer* for appellant.

(1) A director is a trustee for the entire body of stockholders, and both good morals and good law imperatively demand he shall manage all the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot, directly or indirectly, derive any personal profit or advantage by reason of his position distinct from his coshareholders. Chouteau Ins. Co. v. Floyd, 74 Mo. 291; Hannerty v. Standard Theatre Co., 109 Mo. 297; Proctor v. Farrar, 213 S. W. 469; Ward v. Davidson, 89 Mo. 458; Bandor v. Zimmerman, 80 Mo. App. 138; Moulden v. Train, 204 S. W. 66; 2 Thompson on Corporations (2 Ed.) secs. 1215, 1220. 1221, 1255, 1268.  (2) It was the duty of Lund and Schrand, directors, and Charles G. Knueppel, *de facto* director and officer of this appellant, and trustee of its business, property and money, to keep a correct account and to make a full and correct showing of the receipts and disbursements, and failing to do so they are charged with whatever came into their hands, less the amount shown by them that they disbursed for the use of this appellant. Hannerty v. Standard Theatre Co., 109 Mo. 308.  (3) Laches cannot be imputed where respondents constitute a majority of the board of directors and are alone chargeable with the delay. 14A C. J. sec. 1926, p. 151; 5 Pomeroy's Equity Jurisprudence, sec. 28.

*Bishop & Clairborne* for respondents.

(1) An action to set aside a fraudulent sale of personal property (a lease) and for an accounting must be brought within five years. R. S. 1919, sec. 1317. (a) A lease is personal property. Railroad v Schweitzer, 246 Mo. 129; Orchard v. Store Co., 225 Mo. 414; Tiedeman on Real Property (2 Ed.) sec. 184, p. 151; Kirchwey on Real Property, p. 286; 1 Minor on Real Property, sec. 357; Tiffany on Real Property, sec. 58, p. 146. (b) To suspend the running of the statute of limitations on the ground of fraud, the proof must show that the fraud was not discovered because of some act or deed of the defendant which prevented its discovery. State ex rel. v. Musick, 145 Mo. App. 47; Heisler v. Climer, 179 Mo. App. 110; Wood v. Carpenter, 25 L. Ed. 807. (2) The published advertisement of the sale of August 10, 1915, the filing of the trustee's deed, and the filing of the articles of agreement of the Palladium Amusement Company in the recorder's office constituted constructive notice to appellant. Turmine v. Claybrook, 204 S. W. 178; Johnson v. U. Rys. Co., 147 S. W. 1081. (3) The option to avoid a sale under a deed of trust for fraud must be exercised within a reasonable time, otherwise the action is barred for laches. Twin-Link Oil Co. v. Marbury, 23 L. Ed. 328; Ready v. Smith; 170 Mo. 174. (4) There is no reason why corporation officers and stockholders may not purchase the property of the corporation at a public sale under a deed of trust, provided the purchase is free from fraud and is in good faith and has not been accomplished by any deception practised on the other stockholders. Wiley v. Reaser, 103 S. E. 362; Twin-Link Oil Co. v. Marbury, 23 L. Ed. 328; 3 Fletcher's Cyc. Corporations, chap. 34, sec. 1396, p. 2381.

RAGLAND, P. J.—This is an action to set aside a sale under deed of trust of a leasehold, and for an accounting.

Plaintiff corporation was organized June 8, 1913, with a nominal capital stock of $50,000, divided into 5,000 shares of the par value of $10 each. The original stockholders were C. N. Lund, George Peters and Terrell Peters. The first two each subscribed for 2495 shares and the third for 10. They constituted the board of directors for the first year. Lund was president and George Peters was treasurer and general manager. No cash was paid in by the subscribing stockholders. The corporation's entire capital stock consisted of a lease, running for a term of twenty-five years from August 18, 1913, on a vacant tract of ground in the city of St. Louis on Morgan Street near Grand Avenue. The terms of the lease required the lessee to pay a rental of $2500 a year in equal monthly installments, and all taxes of every kind as and when they became due, and to erect on the demised premises a building of the value of at least $35,000.

For the purpose of obtaining funds to commence the construction of a building plaintiff executed, on August 26, 1913, a deed of trust on its leasehold to secure four principal notes aggregating the sum of $15,000, and nine coupon notes representing the semi-annual interest thereon at six per cent per annum. The first of the principal notes, in the sum of $3,000, was payable July 1, 1915; the interest fell due on January 1st and July 1st, of each year until the principal sum was paid. It was provided in the deed of trust that upon the grantor's failure to pay when due any installment of principal or interest, or any ground rent or taxes, the entire indebtedness should become due and foreclosure might be had. With the proceeds of the loan just referred to any money realized in part from sales effected from time to time of the corporate stock and in part from advancements made by Lund and George Peters the construction of a brick building was begun. The front part of the building was designed for stores and the rear portion for a roller-skating rink. In the early part of December, 1913, the skating rink was completed and fully equipped for operation, but the stores were never finished and gotten ready for occupancy until after the property was sold under the deed of trust. The building, to the extent that it was completed, cost approximately $66,000, and an indebtedness of $20,000 was incurred in advertising and in equipping the skating rink and getting it ready for use. The equipment included roller skates, linoleum, seats, tables, chairs, draperies, electric signs and a soda fountain.

Plaintiff's cash receipts from all sources from the date of its organization to June 1, 1914, were as follows: Proceeds of mortgage loan, $15,000; proceeds of sales of stock, $10,150; advancements made by Peters, $6,000; advancements made by Lund, $3,000; proceeds of loan obtained from Grand Avenue bank, $2,000; and total gross receipts for skating privleges for the season which began December 9, 1913, and ended May 10, 1914, $31,933.25. The exact figures from which could be determined the cost of operating the rink for the period just mentioned were not shown by the evidence. However, Lund who was then president testified that out of the gross receipts they paid, according to his recollection, as much as $14,000 on the corporation's indebtedness for building and equipment. This estimate was liberal in view of other evidence which discloses that plaintiff had to meet a weekly pay-roll of $500, in addition to paying rent, interest and taxes as they fell due. But if Lund's figures be accepted, the total amount of cash received by plaintiff from the time of its organization to June 1, 1914, which it could apply to the payment of the $88,000 indebtedness it had incurred for building and equipment was $50,150. In other words, there was outstanding against it on the date last mentioned matured demands to the extent of $37,850, in

addition to its mortgage indebtedness of $15,000 and that to the Grand Avenue bank of $2,000.

Those who purchased shares in the plaintiff corporation prior to June 1, 1914, were Ruth E. Lund, Vida Elston, M. D. Culver, William F. C. Stenson, Charles G. Knueppel, Ben Schrand, Mrs. H. M. Baker and Hummelscheim Lumber Company. Some of these made further purchases of the stock during the year 1914, and in addition to them one W. W. Menges purchased 130 shares during the latter part of that year. Knueppel had had the sub-contract for the brick work of plaintiff's building, and Schrand that for the painting. Some of the stock that each took was paid for by applying the purchase price as a credit on the amount due him under his contract. Ruth E. Lund was the wife of C. N. Lund. She, Knueppel and Schrand were made parties defendant to this suit.

At a stockholders' meeting held about June 1, 1914, Schrand, C. N. Lund and George Peters were elected directors. Following the stockholders' meeting, a director's meeting was held and Schrand was elected president, Lund vice-president and Peters secretary and treasurer. At the same meeting a resolution was adopted, over Peters' protest, making Knueppel general manager and the custodian of all the property and funds of the corporation. This action was taken because the majority of the board were of the opinion that to enable the corporation to tide over the difficulties which were then threatening its existence, it was necessary that its affairs be put in the hands of someone who had sufficient financial standing or bank connection to borrow money for its use. This, Knueppel did. He obtained an additional loan of $2,000 from the Grand Avenue Bank and one from the Tower Grove Bank of $7,500. In each instance he, and possibly other stockholders, endorsed the note.

Kneuppel was plaintiff's general manager and the sole custodian of its funds from about June 1, 1914, to August 10, 1915. During that time he received for and on behalf of plaintiff funds aggregating $37,177.61, as follows: Proceeds of sales of stock, $3,500; gross receipts from skating-rink patronage, $24,177.61; and the proceeds of the two bank loans just mentioned, $9,500. In order to account for these funds he offered in evidence at the trial of this cause a number of plaintiff's paid notes amounting in the aggregate to the sum of $2,759.71; plaintiff's pay-roll from September 18, 1914, to April 29, 1915, showing a gross total paid by check of $11,528.20; receipts for the ground rent from July, 1915, to May, 1915, inclusive, amounting to $2,291.67; and the testimony of the cashier of the Grand Avenue Bank that $1,000 had been paid on one of the notes held by that bank. In addition to the above he put in evidence checks which had been drawn by plaintiff, "By Chas. G. Knueppel, Manager," on the Grand Avenue Bank and paid by the bank aggregating $24,872.32. The evi-

dence did not disclose what these checks were given for. It was plaintiff's contention that as evidence they were for the most part but duplicates of that previously offered, in that they related to the same items. According to an analysis of the evidence made by plaintiff's counsel in its (appellant's) brief here, Knueppel failed to account for $16,745.29 of plaintiff's funds which came into his hands as general manager. Plaintiff's books of account kept during the time that its affairs were managed first by Peters and then by Kneuppel were not produced at the trial. The evidence tended to show that they had been turned over to Schrand. After the commencement of the suit and before it came to trial Schrand died, and the books could not be found. On July 1, 1915, a principal note of $3,000 and an interest note of $450, secured by the deed of trust, fell due. Ground rent for June was in arrears; that for July was due. And the general taxes for 1914 had not been paid. It was necessary that all of these items, aggregating $4114, be paid in order to prevent foreclosure under the deed of trust. Knueppel reported to the board of directors that he had no funds. Two or three meetings of the stockholders were held for the purpose of devising ways and means of making the payments, but nothing came of them. Presently plaintiff's building and lease were sold under the deed of trust and purchased by Knueppel for $15,721, the exact amount of the indebtedness plus the cost of foreclosure. The purchase money was obtained by borrowing on the property $12,000 through the same agency that had made the original loan, and by C. N. Lund, Ruth Lund, Ben Schrand and Knueppel each furnishing $1,000. The four then organized the defendant corporation, the Palladium Amusement Company, and he conveyed to it the building and lease purchased by him at the foreclosure sale. An equal number of the shares in the new corporation were alloted to each of the organizers; Schrand, Knueppel and C. N. Lund constituted its board of directors.

The Palladium Amusement Company, upon its organization, quietly stepped into plaintiff's shoes, took over its equipment and organization and proceeded to operate the skating rink under the same name under which it had been run by plaintiff, namely, "The Palladium Roller Skating Rink." The defendants also took upon themselves the payment of plaintiff's debts, and within the course of two or three years were enabled to discharge them from funds derived solely from the operation of the rink. C. N. Lund and Ruth Lund were divorced in 1918, and about that time he transferred to her his shares in the Palladium Amusement Company. She thereupon became the owner of one-half of the capital stock of that corporation and she was elected director in his stead.

This suit was commenced September 13, 1921. The grounds of the action appear from the following excerpt from the petition:

"Plaintiff further states that Bernhard Schrand, Charles N. Lund and Charles G. Knueppel thereafter held the offices of president, secretary, treasurer and general manager and were the sole directors of this plaintiff and owned the majority of the capital stock, subject to vote, and were in full, complete and exclusive charge of all of its affairs up to and until shortly prior to June 6, 1921, the exact date plaintiff does not know; that about June, 1914, and as soon as the defendants came in full control and management of plaintiff corporation, they conspired and confederated together to acquire the business of plaintiff without paying any consideration or remuneration therefor, and in violation of their trust as officers and directors of the plaintiff permitted the first principal note, secured by the aforesaid mortgage, to remain unpaid when due, although this plaintiff corporation during all that time had sufficient money, property, credit, income and its stock in its treasury with which to pay same; notwithstanding the foregoing, the aforesaid leasehold, together with improvements thereon, was, on account of aforesaid default in the payment of the first principal and first interest note on August 10, 1915, sold and was bought in by the defendant Charles G. Knueppel for the use and benefit of himself and the other defendants." The relief sought is: "That . . . the sale under the deed of trust aforesaid of the lease and improvement upon said leased property be set aside and that the sale to the Palladium Amusement Company of said lease and improvement on said leased property be also set aside and for naught held, and that the officers and directors of the said Palladium Amusement Company be directed and required by this Honorable Court to account to plaintiff for all of the net earnings of the defendant Palladium Company from the time of its incorporation to date, and to turn the property, business, money and effects over to this plaintiff, and for such other relief as to the court may seem meet and just."

Vida Elston, M. D. Culver and Mrs. H. M. Baker, in 1917, tendered to plaintiff the shares of its stock which they had theretofore purchased, and brought suit to recover the purchase money, on the ground that the sales had been effected through misrepresentation. A several judgment in favor of each was rendered against plaintiff herein on July 6, 1921. The petition in this case recites that the judgment creditors just mentioned, and Stenson, Menges and Peters, stockholders, requested plaintiff to bring the suit.

The answer of the defendants, Palladium Amusement Company, Knueppel and Lund, consisted of general denials and pleas of the five-year Statute of Limitations and laches.

The circuit court found the issues for the defendants and dismissed plaintiff's bill. The facts shown by the evidence will be further

developed in the course of the opinion in connection with the questions considered.

The essential contention of the appellant is that on July 1, 1915, it had sufficient funds and credit to have enabled its board of directors and general manager to meet all payments required of it by the terms of the deed of trust, but that notwithstanding that fact they permitted its property to be sold at a foreclosure sale in order that they might acquire it for themselves for a nominal consideration. In support of that contention it relies on Knueppel's failure to show the precise disposition he made of every dollar that came into his hands during his management of its affairs. It is unquestionably true that the officers and directors of a corporation are in a sense trustees, and that as such it is their duty to keep correct accounts, and to be able to make a full and correct showing of the corporation's receipts and expenditures. [Hannerty v. Theatre Co., 109 Mo. 297, 308.] But in a case where through the lapse of time and the loss of records a corporation's officers and agents are unable to render a bookkeeper's account of the disbursements made of its funds, it cannot be held that such funds on a given date were still on hand, in the face of evidence which on the whole convincingly shows the contrary. Such is the case.

The plaintiff's total receipts from all sources during Knueppel's administration, including the money he borrowed for it, was $37,-177.61. It is conceded that he properly paid out for plaintiff the sum of $17,582.58. The unaccounted for balance of $19,295.03 was not sufficient by half to satisfy the demands of creditors who during all of that time were clamoring for payment. That it was paid, as Knueppel says, on the nearly $40,000 of unsecured indebtedness with which the plaintiff was burdened at the time he took charge of its affairs there can be but little doubt.

At the several stockholder's meetings held for the purpose of devising means with which to pay the deed of trust notes coming due July 1, 1915, the financial affairs of the plaintiff were fully and freely discussed. There is no pretense that there was any concealment of any kind.

George Peters, on whose initiative the present action was brought, testified: "I left St. Louis the summer of 1915, May or June. I knew that the company did not have the money to meet the note. I knew the company was cramped for finances all of 1914. I do not recollect the taxes; I knew they were unpaid. I knew under the deed of trust and under the lease they could put us out for non-payment. When I left in the summer of 1915 the company had no money and I knew we were in default. I asked Mr. Knueppel and I asked Mr. Lund and Mr. Schrand why they were not selling any treasury stock to meet this indebtedness."

C. N. Lund who has ceased to have any interest in the Palladium Amusement Company was called as a witness by plaintiff. He stated: ''At the time the different sums of money were due that are enumerated to me, I don't think there was any money to meet them. We were paying out money as fast as we could get hold of it. The lease provided that if we did not pay the taxes, the interest and the principal, the property would be taken away from us. We didn't have $4,000 to cover those items. We had no collateral outside of the equity that we may have (had) in the building and equipment. We still owed money on the building. I don't know whether the equipment was paid for or not. That might have been cleared off at that time. We had nothing at that time except the building—the leasehold and equipment.''

Knueppel, who testified on behalf of himself and his co-defendants, said: ''Mr. Peters, Mr. Lund, Rodney Peters and all of them were connected with the rink from time to time; knew exactly the conditions of our business; were there every day like myself. Many a time I called them after the sessions and asked them what could be done to help the business along so that I could get more money to pay our obligations, our pay-rolls, etc. We did not have enough money to pay our men at the end of the week, or when the pay-roll became due. I remember distinctly getting the money from Rodney Peters. He had the money in the bank and paid the pay-roll. I returned it later on. At the end of the season there was not any money in the bank. I mean the season from 1914 to 1915, in June. I mean to say, when the season closed down, from September to May, 1915. We had that meeting, am quite positive, that with the exception of Mr. Stenson every other member of that corporation was there at that time, and I told them the condition and asked them if they would do something in regard to helping the financial affairs of the Palladium. They all listened to it and one by one and two by two went away and left me to hold the bag, because I put my signature to $7,500 borrowed from the Tower Grove Bank. No one to my knowledge offered any suggestion. I was about the last one to leave the meeting.''

There was no suggestion in the evidence that the sale under the deed of trust was brought about through any previous arrangement, request or connivance on the part of any of the defendants. It followed in due course upon default in the payment of installments of principal and interest which had become due, and it was conducted openly, regularly and in conformity with the terms of the instrument under which it was had and the custom which prevailed in the city of St. Louis with respect to such sales. The understanding that the defendants did have with each other with reference to a foreclosure sale and the course they would pursue in the event it was had, is

fairly disclosed by the following excerpt from the testimony of C. N. Lund:

"We first spoke of organizing the Palladium Amusement Company at the time of the foreclosure of the Grand Amusement Company. It was generally understood that if the Grand Amusement Company was sold out and we bought it in we would organize it under the name of the Palladium Amusement Company for our own benefit. The property was bought in at the sale for the benefit of Bernhardt Schrand, Mr. Knueppel, Mrs. Lund and myself. That was all agreed upon prior to the foreclosure. It was agreed between us that each was to receive a quarter interest of the company."

Menges testified: "There were present at the time (early part of 1915) Mr. Lund, Mr. Knueppel, myself and Mr. Schrand. They discussed the foreclosure of the mortgage. They discussed, that if we pay the bills as fast as the money came in there would be no money to pay on the mortgage, and they would have somebody to foreclose and buy it in among ourselves, and we would control it amongst the five of us. . . . I was starting to get cold feet and wanted to get out of it, and Schrand and the rest wanted me to go in with them. and after I got cold feet I just pulled out and lost my stock. They didn't want any of the stockholders to get in the matter and get the money elsewhere. They didn't want to get the money elsewhere; they wanted to allow them to fall due, so they could foreclose on them, and they would buy it in, which was finally done." Menges was not only contradicted by the others, but his testimony is without support or corroboration by any other evidence in the case.

It is obvious that stock could not have been sold to meet the emergency as suggested by Peters because of the corporation's desperate financial plight; and it is equally manifest that it could not borrow money on its own credit.

From the evidence as a whole we find that the defendants in good faith exhausted every resource of the corporation in an effort to meet its payments under the deed of trust. Not only that, but the other stockholders were afforded a full and complete opportunity to protect their interest in the same way that the defendant did theirs. Had they in the first instance been willing to make reasonable contributions from their own funds to tide the corporation over the crisis in its affairs the foreclosure sale could have been prevented. Their bill in so far as it seeks to have that sale now set aside is without equity. [Wiley v. Reaser, 103 S. E. (W. Va.) 362; Twin-Lick Oil Company v. Marbury, 23 U. S. (Law Ed.) 328.]

Plaintiff's bill further seeks an accounting as to the equipment and other personal property which it used in connection with the skating rink and which were not covered by the deed of trust, but which the defendants appropriated. The original cost of this property according

to a summary made from the evidence by appellant's counsel was $6,720. The amount is much less than that of plaintiff's notes upon which Schrand and Knueppel were obligated as endorsers and which the defendants paid. An accounting would therefore avail plaintiff nothing.

The judgment of the circuit court is affirmed. All concur, except *Graves, J.,* absent.