In re TELESPORT, INC., Debtor.

TELESPORT, INC., Plaintiff,

v.

Frank Randolph VESTAL, William G. Dance, Roland V. R. Martin, J. B. Edwards and F. Randolph Vestal Enterprises, Inc., Defendants.

Bankruptcy Nos. AP 81–669, LR 81–887.

United States Bankruptcy Court,
E. D. Arkansas, W. D.

May 19, 1982.

On Motion to Alter or Amend Judgment or for a New Trial Aug. 8, 1982.

Gregory Hopkins and Joe Polk, Little Rock, Ark., for plaintiff.

Overton S. Anderson and Joe Kilpatrick, Little Rock, Ark., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT DENYING ALL PLAINTIFF'S CLAIMS FOR RELIEF EXCEPT DIRECTING AN ACCOUNTING FOR ALL PROFITS GAINED BY F. RANDOLPH VESTAL ENTERPRISES, INC. THROUGH USE OF A CERTAIN TELEVISION FILM

DENNIS J. STEWART, Bankruptcy Judge.

This is an action sounding in breach of contract, unjust enrichment, and violation of corporate fiduciary duties brought by a chapter 11 debtor-in-possession against former officers and employees of the debtor-in-possession and the corporation alleged to have been newly formed by them. After an ample pretrial discovery period and the allotting of time for filing documents in accordance with a pretrial order which had been issued by the court, the matter came on for hearing on April 5 and 6, 1982, in Little Rock, Arkansas. Thereupon, the plaintiff appeared by counsel, Gregory Hopkins, Esquire, and Joe Polk, Esquire, and the defendants likewise appeared personally and by counsel, Overton S. Anderson, Esquire, and Joe Kilpatrick, Esquire. The evidence which was then adduced warrants the following findings of fact.

## FINDINGS OF FACT

Prior to the date of the inception of these chapter 11 proceedings, the debtor-in-possession, Telesport, Inc., was a subsidiary of the J. T. Lloyd Company, a wholesale distributor of sporting goods. The J. T. Lloyd Company was itself a subject of chapter 11 proceedings, remaining a debtor-in-possession under a plan of reorganization which was confirmed in October of 1980. Under that plan, creditors of the J. T. Lloyd Company were made shareholders and their representatives became the Board of Directors of J. T. Lloyd Company. One of the creditor-shareholders who became a director was Landell Bowman.

The debtor in these chapter 11 proceedings, Telesport, Inc., was under the general management of Frank Randolph Vestal, who was also a vice president of the J. T. Lloyd Company. Its principal functions were to produce television programs on the subject of fishing, which featured the defendants, William G. Dance and Roland V. R. Martin. Sponsors of these programs would frequently pay for their sponsorship by granting sporting goods manufactured by them *in specie* to Telesport, Inc., which would be then distributed by the J. T. Lloyd Company.

In the summer of 1981, both J. T. Lloyd Company and Telesport, Inc., had financial problems. These problems resulted in the resignation of Turner Lloyd as the chief executive officer of the J. T. Lloyd Company and the impasse in the hegemony of Telesport, Inc., which gave rise to the action at bar.

After the resignation of Turner Lloyd as the chief executive officer of the J. T. Lloyd Company, Landell Bowman became the chairman of the Board of Directors of the J. T. Lloyd Company. The defendant, Frank Randolph Vestal, became president of the J. T. Lloyd Company and of Telesport, Inc. Mr. Bowman, with the support and backing of a powerful secured creditor of J. T. Lloyd Company, began to assert a greater right to manage the Telesport operations. This was opposed by Mr. Vestal, who conceived of the Telesport operation as one which had had its genesis and development and full culmination under his personal direction. As the struggle for power in the Telesport operation grew more intense, the Board of Directors proposed, as a compromise, that Mr. Bowman and Mr. Vestal should serve as co-chief executive officers of the Telesport corporation for a period of 90 days, at the end of which the above mentioned secured creditor would select either Bowman or Vestal as the permanent chief executive officer.

In this same time frame, the evidence demonstrates that Frank Randolph Vestal began to make at least contingent plans for the formation of another corporation in the event that the co-chief executiveship of Mr. Bowman became a reality. Some conversations were held with at least one of the employees of the Telesport corporation concerning the possibility of forming another corporation subsequent to any resignation which Mr. Vestal might feel forced to submit.[1] Sometime before resignation, he held a meeting of corporate employees in which he stated that he held the key to the future of the operation and that it should therefore continue to operate under his leadership and control. There is some evidence to the effect that he went so far as to assert that he had the power to destroy Telesport if he were replaced as its chief executive.[2] And, according to the evidence of record, his statements were to the effect that the future endeavors of Telesport would be foredoomed without his control and leadership.

---

1. The testimony, rendered by a former employee of Telesport, Inc., was in fact not directly contradicted in any material sense, but it is also sketchy and uninformative in respect of evidencing any bad faith conspiracy to violate any fiduciary responsibility to the plaintiff corporation.

2. It is maintained by the defendants that this statement, if made, was made on July 6, 1981, only a day before Vestal's resignation. The testimony of the plaintiff's witness, Wilma Alletag, is uncertain as to the time when she heard Mr. Vestal make the statement, variously stating that the statement was made in late June or early July of 1981 or "a day or two" before his resignation.

There is no evidence of any probative weight that he elaborated at that time on the reasons for his conclusion to this effect.

Mr. Vestal found the suggestion that Mr. Bowman serve as a co-chief executive particularly repugnant for several reasons. Admittedly, he did not like Mr. Bowman. Further, Mr. Bowman was from a distant city, Los Angeles, California, and his acting in a managerial capacity dictated that he travel frequently back and forth at company expense. And, in the meantime, Mr. Bowman was to be able to exercise some remote control of the operations from Los Angeles. Admittedly, he viewed the suggestion of the Board of Directors in this regard as a 90-day notice of termination and stated to the Board that, if it were given effect, he would resign all his positions with the Lloyd complex of corporations. Subsequently, on July 7, 1981, at 10:00 a. m., when Mr. Bowman appeared on the premises for the ostensible purpose of participating in the management and control of Telesport, Inc., Mr. Vestal submitted his resignation, effective forthwith.

As of the date of this resignation, there is little doubt in the evidence that Telesport was insolvent and was unable to pay its debts as they fell due. According to the testimony of Landell Bowman, he had arranged for the infusion of some $125,000.00 in capital into the Telesport corporation by means of a loan and also had some $600,000.00 in "product" on hand—the television programs and the like or the merchandise which could be sold for value—which could have been liquidated to sustain the operations for at least a limited time in the future. According to the testimony which was adduced by the defendants, the proposed infusion of cash by this means would not have been sufficient to restore Telesport to an operable solvent status for some great period of time.[3]

The other defendants—Dance, Martin, and J. B. Edwards,—quickly followed suit in resigning. The Dance and Martin resignations took place on July 10, 1981, effective 31 days in the future. Their respective letters of resignation cited, in part, the financial incapabilities of Telesport to sustain its operations. According to the testimony of both Dance and Martin, they did not discuss the possibility of forming a new corporation with Frank Randolph Vestal, or any agent of his, prior to the time when they learned of his resignation. When they learned of Mr. Vestal's resignation, however, they made quickly their respective decisions to resign. They stated that this in part was based upon their personal friendships with Mr. Vestal and in part upon the fact that all the sponsors and prospective sponsors, substantially, were friends of Mr. Vestal and were not likely to continue business with Telesport after his resignation from it.

In this respect, there is really no evidence which directly contradicts the testimony of the defendants in this regard, except the testimony of one former employee to the effect that he participated in and overheard some conversations respecting the possibilities of forming a new corporation and the making of some possibility or contingent plans in the event that this became necessary.

Shortly after his resignation from Telesport, Inc., Frank Randolph Vestal formed the corporation entitled Frank Randolph Vestal Enterprises, Inc., doing business as Cinesport, Inc. Its business was to be essentially the same as that of Telesport, Inc., had been. Other employees of Telesport quickly became employees of Cinesport. As noted above, the other defendants, Edwards, Dance and Martin, followed Vestal's lead in resigning from Telesport (with the aid of resignation letters drawn up by Vestal's counsel) and in enlisting as employees of Cinesport.

The contracts of the plaintiff with Dance and Martin had a non-competition clause in

---

**3.** This testimony is, in substance, uncontradicted insofar as it maintains that the "product" could not be sold in total for a considerable period of time and that the $125,000.00 loan which Mr. Bowman states he had arranged would not have been sufficient to restore Telesport to operating condition.

each of them, under the terms of which, if the employees were to "break" the contract, they were to "refrain directly or indirectly from participating in any similar activities in which (they were) participating while associated with Telesport, i.e., television shows, film production of any type" for a period of two years in the case of the defendant Dance and for a period of one year in the case of the defendant Martin. Among the grounds for termination of the employment contracts of Dance and Martin was inability of the corporation to perform its contracts. See paragraph V of the contracts to the following effect:

"It is recognized by all parties hereto that the successful performance of this contract by each is dependent upon ... the financial capabilities of Telesport. Should (Telesport) become unable to perform, it is agreed that this contract may be terminated by either party without penalty upon giving to the other party hereto written notice of the reasons mentioned above for such termination thirty days prior to the date of termination."

Before the expiration of this 30-day period, in late July or early August, 1981, the defendants attended an industry meeting or exposition in Florida. The evidence shows that, during this time, the defendants had some discussions involving the planning for the formation of a new corporation and that, further, they solicited some new sponsors for their planned productions of the programs of Dance and Martin, including sponsors who currently had contracts with the debtor corporation. The evidence does not affirmatively show which of the old sponsors were the subject of any blandishments in this regard nor which of them resulted in the signing of contracts with the new corporation which was being formed by Frank Randolph Vestal.

But ostensibly as the result of the soliciting undertaken by the defendants at the Florida sports show, the agreements of August 10–11, 1981, were entered into by Frank Randolph Vestal's new corporation, Cinesport, Inc., with several sponsors, at least some of whom in the past had been sponsors for the Dance and Martin shows which were produced by Telesport, Inc. On this critical issue, however, the proof which has been adduced by the plaintiff is quite imperfect. It has largely consisted of repeated but general allusions to the fact that several of Telesport's former sponsors now became the current sponsors of the Dance and Martin shows. It was never sufficiently stated or shown that, as to any or all of the sponsors who signed sponsorship contracts with Cinesport during this period of time, they had existing contractural relationships with Telesport, Inc., which were tortiously interfered with. This court cannot speculate concerning this crucial defect in the evidence beyond noting that it followed upon the above-noted failure and refusal of the parties to comply with the court's pretrial order.[4] Some pains were taken to demonstrate that the forms in which Cinesport cast its contracts with its new sponsors were in all essential respects the same as those which had previously been used by Telesport. But the evidence also shows without contradiction that the form used was one commonly used throughout the industry.

While Cinesport, Inc., was still a struggling infant corporation, it found a need to create some revenue by using a recording of a television program which had been created and initially recorded by Telesport, Inc. The evidence shows that the reel of film came to be in the possession of Cinesport in the following manner: While he was still an officer of Telesport, Frank Randolph Vestal had a conversation with one of the sponsors of Telesport's television productions, Charles Spence, the president of Strike King Lure Company. This conversation appears to have taken place while Turner Lloyd was still the president of J. T. Lloyd Company and before Mr. Vestal was

---

4. If the provisions of the pretrial order had been complied with in respect of the summarizing of voluminous documents and other required pretrial findings, it would have required some reflection upon the elements of the claims and their outlining in terms of the available proof.

to give serious consideration to resigning as a corporate officer of Telesport. Mr. Spence conveyed to Mr. Vestal a desire to have the film for the purpose of advertising some of Strike King's products. It was Vestal's initial decision to donate the film to Spence as a gift. According to the testimony of Vestal and Spence, this initial decision was overruled by Mr. Lloyd, who held that some charge must be made for use of the film. The testimony of Vestal is at odds with that of Spence on the consideration paid; one version is $2,000.00; the other $1,500.00. Without any written agreement or other ceremony, a copy of the film was then turned over to Spence. Then later, when the newly-created Cinesport was desperate for revenue, and the situation was made known to Spence, he donated the film to Cinesport which then ran the film on television and gained revenues which are not disclosed by the evidence.

As noted above, the evidence which was adduced in the hearing of this action leaves no doubt of the continual insolvency of Telesport throughout the period of time encompassing the events here in issue. The plaintiff contends, however, that, if it had had the ability and opportunity to produce the Dance and Martin shows for the ensuing year, some $900,000.00 in profit might reasonably have been expected.[5]

---

5. Mr. Bowman's testimony in this regard is not contradicted in essential part by the other evidence of record. ·

6. In contemplation of law generally, there is no dissent from the proposition that "[t]he relationship of officers and directors to a corporation is a fiduciary one imposing upon them the duty to exercise their powers as officers and directors solely for the benefit of the corporation and its stockholders." *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex. Civ.App.1976). See also, to the same general effect, *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802 (1958).

7. [A]n officer's and director's duty of loyalty to the corporation is unyielding in its demand . . ." *Canion v. Texas Cycle Supply, Inc.*, note 6, *supra*, at 513.

8. See, e.g., *Motorola, Inc. v. Fairchild Camera and Instrument Corp.*, 366 F.Supp. 1173, pp. 1181, 1182 (D.Ariz.1973) (See decisions there

## CONCLUSIONS OF LAW

The plaintiff asserts on the basis of the foregoing facts that the defendants have violated their duties to it and therefore must be required to pay to plaintiff damages, chiefly for the $900,000.00 which it is argued that Telesport could have expected to profit had the Dance and Martin contracts not been terminated. The defendant, Vestal, as a corporate officer, stood in the position of a fiduciary to the debtor corporation.[6] In such position, he owed it to the corporation to accord it his undivided loyalty.[7] Hence, while he was still a corporate officer, he was bound by his position and the duties thereby incumbent upon him not to act contrary to the corporate interest. This duty, according to the weight of authority, did not attach after the effective date of his resignation as a corporate officer, so that, after his resignation, he could expect to engage in lawful enterprises which were in competition with Telesport, Inc.[8] He might, even while still an officer of the debtor corporation, make plans, quite possibly in concert with others, to form or join a competing enterprise after the effective date of his resignation.[9] He might not, however, then act contrary to the interests of the corporation while still an officer of it. Thus, it would have been improper, and inconsistent with his duty as a corporate officer, to make use of his position while

---

cited permitting post resignation competition and planning therefor with other employees prior to resignation); *E. W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1113, (8th Cir. 1969) (Corporate officers "were entitled to resign . . . for a good reason, a bad reason, or no reason at all, and are entitled to pursue their chosen field of endeavor in direct competition with [the corporation] so long as there is no breach of a confidential relationship with [it].").

9. See *Metal Lubricants Co. v. Engineered Lubricants Co.*, 411 F.2d 426, 429 (8th Cir. 1969) ("The law recognizes that employees may agree among themselves to compete with their employer upon termination of their employment . . . They may plan and prepare for their competing enterprise while still employed . . . without the necessity of revealing the plans to the employer.")

still serving as an officer of the corporation for the future benefit of a competing organization.[10] The key words in this melange of duties are "good faith." [11]

In applying these standards to the acts and conduct of the defendant, Frank Randolph Vestal, according to the above findings of fact, it must be observed that there is no evidence that any of Vestal's activities prior to the date of his submitting his resignation had any adverse effect upon the debtor corporation or that they were anything but efficient. There is no indication that any of Vestal's activities constituted or contributed to mismanagement of the corporation or had any cause-and-effect relationship to the insolvency of the debtor corporation. There is evidence to the effect that he discussed with certain employees of the corporation the possibility of setting up a new and competing corporation in the future. But, with the one exception which is covered below, there is no evidence that he actually used confidential information which he had gained in his capacity as a corporate officer to benefit this future competitor of the debtor corporation.[12] And, in the course of his struggle for ultimate control of the debtor corporation, there is evidence that he made reference to his power to "destroy" the debtor corporation. But there is no evidence that he intended to accomplish destruction by any proscribed means by the use of any confidential information gained by him by virtue of his corporate office.

Under these principles, the resignation of the defendant, Frank Randolph Vestal, from Telesport cannot be considered, in itself, as a breach of any loyalty or fiduciary duty which he owed as a corporate officer. The law does not prohibit the resignation of a corporate officer which is not otherwise prohibited by explicit contractual provision.

If other employees of the corporation follow his lead in resigning, he is liable under the governing principles to his former corporation if he made use of his position as an officer of the former corporation to recruit the other employees in bad faith for his new corporation.[13] The evidence does not show, however, that Mr. Vestal had made up his mind to resign until the actual moment of his resignation. He had previously determined the conditions under which he would resign and had made them known. But the prior indecision in this matter tends to disprove any prior intent to work any harm to Telesport, Inc., a corporation for which Mr. Vestal might well, according to his indecision, be working for in the future.

In fact, the evidence which has been adduced in the action shows, without any contradiction in this respect, that Mr. Vestal had been a loyal, hard-working and effective officer and employee of Telesport, Inc. The services of Dance and Martin had been obtained and retained in large part because of their personal friendship and respect for him. The sponsors, also, were in large part personal friends of Mr. Vestal. But, despite Mr. Vestal's qualities and his hard work and efficiency, the fortunes of Telesport had dropped to the point of insolvency in July, 1981. There is no evidence which indicates that Mr. Vestal was in any sense responsible for Telesport's decline in fortunes. In fact, the evidence tends to show that any success which had been enjoyed by Telesport was almost solely due to the efforts and abilities of Mr. Vestal.

Nevertheless, the organ which represented the stockholders, the board of directors, seemingly oblivious of this crucial merit, proposed to divest Vestal of at least a vital

---

10. See note 7, *supra*.

11. "It is necessary that there be a balancing of the equities between [the fiduciary duty and the right to resign and compete], for if the former is carried to its extreme it will deprive a man of his rights to make a living; while conversely, the latter right, if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and *fair play." National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 39 (Mo.1966) (Emphasis added).

12. See note 8, *supra*.

13. Only "conspiratorial" actions in this respect are deemed to effront the fiduciary concept. See *op. cit. supra* note 11, at 34.

portion of the managing control of Telesport by forcing him to share it with one who was essentially an outsider, unschooled and inexperienced in the business which was conducted by Telesport, whose travel expenses alone promised to be an additional burden for the already-insolvent corporation. These conditions were intolerable to Mr. Vestal and he made known his resolve to resign if they were in fact imposed.

In imposing the conditions in the face of Vestal's known position respecting them, it seems to the court that the board of directors took the risk that Vestal would resign. Further, they either knew or should have known of Vestal's respected position with the key employees, Dance and Martin, and with the various sponsors and they either knew or should have known of Telesport's insolvency. Under these circumstances, the law does not hold that a board of directors can constructively terminate a corporate officer by violating reasonable conditions imposed by him on the continuation of his employment and then successfully sue him to recover some or all of the profits of any competing enterprise entered into by him.[14]

Doubtless, although the evidence does not show it directly, Vestal, Edwards, Dance and Martin discussed the possibility of resigning and forming another, competing corporation and perhaps even made contingent plans as to how and on what schedule they should proceed to attain their goals in this regard. But there is no evidence, direct, indirect, or circumstantial, that any confidential information was used or misused in the process, or any trade secrets, or that any violation of corporate loyalty took place before July 7, 1981. Indeed, inasmuch as the evidence clearly shows that Vestal and the other defendants were uncertain until that date as to whether they would resign, it seems unlikely that they would have wanted to do any harm to Telesport prior to July 7, 1981.

In its posttrial brief, the plaintiff cites authority which, it is claimed, makes the confluence of resignations at or about the same time proof of an earlier conspiracy which was violative of the conspirators' duty of loyalty to the corporation.[15] But the evidentiary inference to be drawn is permissive, not mandatory. And those decisions differ from the case at bar in which, as noted above, the evidence shows that the unequivocal intent to resign did not exist prior to July 7, 1981.

There is no question but that, thereafter, the defendants commenced to work together to put together a competing business. This, however, was after all of them had resigned from Telesport. The plaintiff cites the decision of the Arkansas Supreme Court in *Raines v. Toney*, 228 Ark. 1170, 313 S.W.2d 802 (1958), for the proposition that the duty of corporate loyalty survives the corporate officer's resignation. But that was a case in which contractual provisions gave rise to the principle. Further, the survival of the duty of loyalty must, in light of other authority which with near unanimity permits post-resignation competition with the corporation,[16] this rule must be held to be restricted to the proposition that confidential information or other restricted information garnered in a fiduciary capacity as an officer cannot later be employed to the detriment of the corporation. There is no evidence of that in this action.

14. This is especially so in view of the "rule of reason" and the need for "balancing of the equities," see note 11, *supra*, which must attend the determination of this controversy.

15. See the plaintiff's pretrial brief, where it is observed that, in *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 279 F.Supp. 913, 919 (S.D.N.Y.1968), "the court held that the fact that within 3 months after the Defendant corporation had been incorporated, 5 Chusid employees had 'transferred their allegiance' to the Defendant corporation and at least 2 other Chusid employees discussed the possibility of working for the Defendant pointed *strongly* in the direction that the Defendants were actively soliciting Chusid's employees." But the question is one of permissible inferences. Under the circumstances of this case, in which the evidence shows that the defendants did not decide to resign until shortly before their resignations, it is permissible to infer that there was not the bad faith or conspiracy which implied disloyalty to the corporation.

16. See note 9, *supra*.

In this case, there was no contractual provision which retained the loyalty of Vestal or Edwards after their resignations or forbad them from entering into or forming competing enterprises.

As noted above, the only non-competition clause existing was contained in the employment contracts of the defendants Dance and Martin and it was effective only if those employees "broke" the employment contract. If they resigned for incapability of the corporation to perform its obligations to them, they did not "break" the contracts. The evidence shows that Telesport, especially without Vestal, was incapable of producing the Dance and Martin shows when it was insolvent and the proposals of Mr. Bowman to obtain a $125,000.00 loan and sell existing "product" was insufficient to defray operations in the foreseeable future.

█ There is no evidence, therefore, that the defendants' mere solicitation of sponsorship contracts at the Florida industry meeting in late July, 1981 involved any actionable offense against the debtor corporation. If it were lawful for the defendants to compete with Telesport, then this activity is necessarily permissible. The solicitation of sponsors in the course of the industry meeting in Florida is contended to have involved the misuse of the defendants' former positions with Telesport in several particulars. One is that the contracts made with the sponsors were in substantially the same form as those which were used by Telesport. As noted above, however, the form was one common to the industry and there is no evidence that the defendants purloined Telesport's forms for this purpose. It is shown that the defendants solicited some of the same sponsors who had been sponsors of the Dance and Martin programs by Telesport, Inc. It is further shown that, as the result of the solicitation conducted in Florida, and perhaps elsewhere, several sponsorship contracts were signed with Cinesport promptly after the Dance and Martin resignations became effective. But there is no showing in the evidence either that the sponsors which were then signed by Cinesport were those which had been Telesport's sponsors nor that any of them had still-existing contracts with Telesport. Had this latter showing been made, a viable claim of tortious interference with contractual relations may have been made out.

As it is, however, according to the above considerations and authorities, no case of bad faith is in any respect made as to the resignations of the defendants and their subsequent activities in competition with Telesport. In respect of all the defendants, there was sufficient cause for the resignations and the competition which followed thereupon does not appear from the evidence adduced to have used any trade secrets or confidential information or any abuse of their prior respective positions with Telesport, Inc.

The decision may perhaps be different if the defendants had bolted from a viable and solvent corporation, and deserted its stockholders for no good reason, and entered into competition with it. But, in this case, the corporation was insolvent through no demonstrated fault of the defendants and there was reason for their respective resignations and the competition then entered into is not shown generally to have been unfair or illegal competition.[17]

█ In one limited respect, however, the defendants did use the property of Telesport to gain profits for the new corporation

17. Ordinarily, under the apothegmatic principles which govern the conduct of corporate fiduciaries, "[a] corporation's financial inability to take advantage of a corporate opportunity is one of the defenses which may be asserted in a suit involving an alleged appropriation of a corporate opportunity." *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex.Civ. App.1976). The plaintiff, in its posttrial brief, insists that the fact of insolvency is "not controlling." But, even if not always controlling, it is controlling under the facts of this case when other factors, including the defendants' preeminent positions in the functioning of the corporation, show the corporation incapable of operations if they were relegated to subordinate positions. Cf. *Coupounas v. Morad*, 380 So.2d 800 (Ala.1980). And, under these circumstances, it is immaterial and not evidence of bad faith that Vestal, after resignation, offered to purchase Telesport for a nominal sum.

known as Cinesport. This was in using the television film acquired from Strike King Lure Company. Under the facts found above, the court cannot torture from the absence of evidence of any written agreement any transfer of "exclusive right" to use of the film to Strike King Lure Company. This is especially so when Telesport, Inc. kept a copy of the reel, ostensibly for its own use. This circumstance prevents the court from finding that the transfer to Strike King was for anything but the transferee's own limited use, and that Telesport otherwise retained its property rights in the film. Its appropriation by the new corporation makes it liable to plaintiff for the profits yielded from its showings.

It is therefore, for the foregoing reasons,

ADJUDGED that plaintiff's complaint for relief be, and it is hereby, denied in all respects except the following. It is further

ADJUDGED that, within 20 days of the date of this judgment, the defendant Frank Randolph Vestal, Inc., d/b/a Cinesport, Inc., account to plaintiff for any and all profits which it derived from any showings of the above.

## ON MOTION TO ALTER OR AMEND JUDGMENT OR FOR A NEW TRIAL

This court formerly issued its written findings of fact, conclusions of law and final judgment denying in part and granting in part the plaintiff's prayer for relief. The plaintiff now moves to alter or amend that judgment or for a new trial on a multitude of grounds.

The greatest number of assertions of error is comprised of contentions that the court failed to make certain findings which were warranted by the evidence adduced. The findings which are now urged upon the court by the plaintiff are of facts which are immaterial to resolution of the issues in this action and which, even if all were made the subject of explicit findings, would not change the result in this action.[1] They are therefore of no consequence and these asserted grounds for alteration or amendment of the judgment, or for a new trial, must accordingly be denied.

■ It is asserted by the plaintiff that the court erroneously made the fact of the plaintiff's insolvency determinative of the issue of whether the defendants, or any of

---

1. Defendants assert that the court failed specifically to find that there were certain pre-resignation and post-resignation activities and plans made by the defendants. Thus, it is noted that the court did not explicity find that "Dance and Martin met with Vestal and Edwards in Little Rock on July 8th and 9th, 1981, to discuss circumstances surrounding the resignations of Vestal and the other Telesport employees to inquire whether Vestal could produce the Dance and Martin television shows"; that "Dance and Martin, while in Little Rock on July 8th and 9th, did not attempt to contact anyone at Telesport or the J. T. Lloyd Company to hear the plaintiff's side of the story regarding the resignations, even though Dance submitted an expense voucher to Telesport for the trip which carried the notation of 'L. R. meeting with Vestal and sponsor'"; that "[t]he Court's findings of fact set out that Dance's and Martin's resignation letters were written by Vestal's counsel, but failed to set out that Vestal's counsel (Gary Gibbs) was also general counsel for both of the Plaintiff corporations"; that "Dance and Martin discussed employment relationships with Vestal and Vestal Enterprises in late July and tentatively agreed on a contract at the Atlanta Fishing Tackle Show (August 4 through 8, 1981), which was prior to the August 10th effective date of Dance's and Martin's resignation"; and that "Dance and Martin attended the Atlanta Fishing Tackle show and talked to previous sponsors in the presence of Vestal and Edwards and on behalf of Vestal Enterprises." The making of these findings would not change the result arrived at by the court in the challenged judgment. The court, in that judgment, found that planning for the formation of a new corporation took place in July and August, 1981; that, in August 1981, contracts of sponsors were solicited by the defendants; and that all this took place prior to the effective date of the Dance and Martin resignations. But, without more, the court previously found, these findings do not entitle the plaintiff to relief. "The law recognizes that employees may agree among themselves to compete with their employer upon termination of their employment ... They may plan and prepare for their competing enterprise while still employed ... without the necessity of revealing the plans to the employer." *Metal Lubricants Co. v. Engineered Lubricants Co.*, 411 F.2d 426, 429 (8th Cir. 1969). Further, as is noted in the challenged judgment and in note 5, *infra*, the solicitation of sponsors in Florida did not result in any measurable damages to the plaintiff.

them, violated their fiduciary duties to it.[2] The law, it is said, provides for liability regardless of the fact of insolvency.[3] The governing law, however, provides that, while a court need not regard insolvency as the sole or determinative factor on the corporate loyalty question, it may nevertheless, as this court did, give consideration to the fact of insolvency in making the determination.[4]

■ Finally, it is asserted that this court erred in finding that plaintiff failed to show that it had any contracts still in force and effect with any of the sponsors at the time Cinesport, Inc., made its contracts with them.[5] In this regard, the bare and unexplained documentary evidence (originally said, at the time of its offer by the plaintiff, to be relevant only to show the expropriation of the *form* of the agreements by the defendants[6]) is said to show that a contract between plaintiff and the sponsor Daiwa was in effect at the time a new contract was entered into between the defendant Cinesport and the same sponsor.[7] But there is no contract among the documentary evidence deposited with the court purporting to show that Daiwa had an ongoing contract with Telesport in August, 1981. There is only a contract evidencing Cinesport's agreement with Daiwa effective in late 1981. But even if defendants' factual contention in this regard were correct, the mere submission in evidence of the contract, without more, is insufficient to establish the right to relief now claimed by the plaintiff. There was no evidence that the plaintiff's contract had not earlier been ter-

**2.** The plaintiff asserts in its postjudgment motion that "the Court suggest[s] in its opinion that Telesport's insolvency excused the actions of the Defendants." The court did not hold, however, that insolvency was a complete defense, but only that it was one fact to consider in a case such as that at bar. See note 17 to the memorandum of judgment. This view of the law is supported even by the case authorities cited and relied upon by defendants. *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 124 (2d Cir. 1934). ("In support of the proposition that the prohibition against corporate officers acting on their own behalf is removed if the corporation is itself financially unable to enter into the transaction, the appellees cite *Hannerty v. Standard Theater Co.*, 109 Mo. 297, 19 S.W. 82; *Grand Amusement Co. v. Palladium Amusement Co.*, 315 Mo. 907, 287 S.W. 438; *Jasper v. Appalachian Gas Co.*, 152 Ky. 68, 153 S.W. 50, Ann.Cas. 1915B 192. However, in the two latter cases the corporation was in fact insolvent . . . [T]he facts . . . tend to show the wisdom of a rigid rule forbidding the directors of a *solvent* corporation to take over for their own profit a corporate contract on the plea of the corporation's financial inability to perform." [Emphasis added.] ); *Faraclas v. City Vending Co.*, 232 Md. 457, 194 A.2d 298 (1963) (Insolvency does not, without more, excuse the corporate officer's usurping a corporate opportunity when the insolvency may be reversed in the future.)

**3.** See note 2, *supra*.

**4.** See note 2, *supra*.

**5.** In its postjudgment motion, the plaintiff contends that "[t]he Court's findings of fact erroneously reflect that Telesport had no existing contractual relationships or legitimate business expectancies with any of the sponsors which the Defendants solicited. The Plaintiff introduced substantial evidence both in the form of testimony and in the form of signed contracts from the 1980 and 1981 Telesport seasons showing that Vestal Enterprises had at least 12 sponsor contracts with previous Telesport sponsors. Of these sponsor contracts, Telesport had a valid contract in force with one sponsor (Daiwa) at the time Vestal Enterprises entered into its contract and Telesport further had legitimate expectations of entering into contractual relationships with the other 11 sponsors in the absence of the activities engaged in by the Defendants". The fact that a valid contract was in force is sought to be shown only by the face of the contract which was allegedly offered in evidence for the sole announced purpose of evidencing the *form* of the contract. As a matter of fact, as noted in the text of this memorandum, there is no such contract in evidence. But even if there were, it would be insufficient to serve as proof of the existence of a contract which was interfered with by defendants, absent other evidence that the contract had not been terminated and was still in effect. Further, even if there were evidence to that effect, there is absolutely no showing in the evidence of any injury or damages.

**6.** This failure to discern the appropriate issue, as the court has previously noted, may well have derived from the parties' ignoring the court's pretrial order which was disregarded, in part, to delineate the issues for trial.

**7.** See note 5, *supra*.

minated.[8] Further, there was no evidence that the plaintiff suffered any damage or injury by reason of any contractual interference by the defendants. And it is rudimentary that a party must prove damages as an element of the case indispensable to recovery.[9] The other allegations of error are frivolous.

It is therefore, for the foregoing reasons,

ORDERED, that the plaintiff's motion to alter or amend judgment or for a new trial be, and it is hereby, denied.

---

8. Nor is there any other affirmative evidence of any direct interference with existing contractual relationships.

9. "[I]n an action for damages, in excess of nominal damages, for breach of a contract, [a party] must show a compensable injury to the plaintiff resulting from the alleged breach of the pleaded contract." 22 Am.Jur.2d sec. 270, p. 365 (1965).